[No. D019002. Fourth Dist., Div. One. Nov. 18, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
RICKY SANDOVAL, Defendant and Appellant.

**COUNSEL**

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster and Bradley A. Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**NARES, J.**—Ricky Sandoval (Sandoval) was convicted by a jury of 11 armed robberies, 1 attempted robbery, and attempted murder, with Sandoval's having personally used a firearm on all counts and having inflicted great bodily injury on the victim of the attempted robbery and murder also found true by the jury. In separate proceedings, the court found true allegations

Sandoval had suffered two prior prison terms (he was on parole at the time of the present offenses) and also had suffered a prior serious felony conviction. Sandoval now asserts error in the exclusion of evidence, and also claims there were many sentencing errors. As there is no merit in either of these assertions, we affirm the judgment.

## BACKGROUND[1]

During the first three months of 1992, San Diego County businesses were subjected to a one-person reign of terror by Sandoval, who was nicknamed the "Isotoner Bandit" because of his habit of wearing gloves during the commission of many of his armed robberies. Sandoval, who would also change his clothing and appearance to avoid identification, committed more than a dozen such terrorizings of San Diego businesses. Sandoval also attempted to murder one robbery victim who had refused to cooperate with Sandoval's demands.

### A. The Crimes

#### 1. First 7-Eleven robbery

In the early morning hours of New Year's Day, 1992, Sandoval entered a Chula Vista 7-Eleven store wearing a baseball hat, gloves, glasses, a mustache, and also a black automatic firearm. Sandoval demanded money from the clerk, Russell Richardson, and told him that if he (Richardson) pushed a security button he "would be dead." Sandoval also pointed his weapon at a customer who entered the store, ordering him to the back. Sandoval then fled with his robbery proceeds of approximately $60. Richardson identified Sandoval at a live lineup[2] and at the preliminary hearing.

#### 2. First Pizza Hut robbery

On the evening of January 12, Sandoval entered a Pizza Hut store on Mira Mesa Boulevard, where Eric Johnson was the manager. Among other employees present during the robbery were Mike Claros and James Pacheco. Sandoval was again wearing a dark hat, glasses, and a mustache, but was not wearing his gloves. Sandoval pointed his firearm at the employees, ordered them to the rear of the store, and demanded money. After he had obtained

---

[1]While Sandoval engages in an extensive discussion of the various eyewitness identifications in this case, he nowhere mounts any challenge to the sufficiency of the evidence received at trial to support his convictions. The recitation of the evidence is accordingly abbreviated.

[2]Two lineups including Sandoval were conducted and also videotaped in June 1992, and the videotapes were played for the jury in this case.

about $50, Sandoval ordered his victims into the bathroom. While Johnson was not "absolutely" certain of his identification, both Claros and Pacheco recognized Sandoval from a television report of another robbery, and Pacheco had identified Sandoval at a live lineup and at the preliminary hearing, and as the person shown on a surveillance videotape committing the Subway Sandwiches robbery (*infra*).

### 3. *Second Pizza Hut robbery*

Late on the morning of January 24, Sandoval entered a Pizza Hut store located on University Avenue, where Bahman Mozaffarian was the manager and Freddy Valenzuela worked as a cook. Sandoval again wore his baseball hat, gloves, and glasses, but was not wearing his (fake) mustache. Sandoval placed a firearm on the counter and, after getting about $80, ordered his victims into the bathroom, threatening them that "if you peek out, then I'll blow your head off." Both Mozaffarian and Valenzuela identified Sandoval at a lineup and at the preliminary hearing.

### 4. *Sullivan's AM-PM Mini-market robbery*

About 1 o'clock in the morning on January 13, Sandoval entered Sullivan's AM-PM Mini-market, off Highway 163. Steven Mulligan was alone in the store when Sandoval entered, again wearing a dark hat, glasses, and gloves. Sandoval placed an automatic firearm on the counter and said, "Put the money in a bag." After he had obtained about $130-$140, Sandoval ordered Mulligan into a back room, and fled. Mulligan identified Sandoval at the preliminary hearing.

### 5. *Arco Station robbery*

About 4 o'clock in the morning on January 15, Sandoval entered an Arco gas station on Balboa Avenue. Richard Asaro was alone in the station when Sandoval entered, again wearing a hat, glasses, gloves and a mustache. Sandoval placed an automatic firearm on the counter pointed at Asaro and demanded money. After he obtained about $150, Sandoval ordered Asaro into a back room, threatening to "blow [his] head off." Asaro was quite sure of his identification of Sandoval at trial and during the lineup, and he identified Sandoval also at the preliminary hearing.

### 6. *Subway Sandwich store robbery*

On January 21, Sandoval entered another store in which there was a clerk working alone, this time a Subway Sandwich store in Rancho Penasquitos.

Sandoval was again wearing a hat, glasses, gloves and a fake mustache. Sandoval placed an automatic firearm on the counter pointed at the chest of the clerk, Christopher Marsteller, and thus obtained about $100. Sandoval then ordered Marsteller into the back, threatening to kill him if he came out. Marsteller was positive of his identification of Sandoval at trial and during the lineup and at the preliminary hearing. A surveillance videotape of the robbery was played at trial.

### 7. Second and third 7-Eleven robberies

About 5 o'clock in the morning on January 22, Sandoval entered a Chula Vista 7-Eleven store in which there was a clerk working alone, Louise Laturno. Sandoval was again wearing a hat and mustache. Sandoval threatened to shoot Laturno, and forced her to hand over the muscular dystrophy charity money and its jar. Sandoval then ordered Laturno to the back of the store, again threatening to shoot her. (A videotape of this robbery was played at trial.) On February 10, Sandoval returned to the same 7-Eleven and again robbed Laturno. Laturno identified Sandoval at trial and also identified Sandoval in the lineup and at the preliminary hearing.

### 8. First and second Party Mania robberies

About noon on January 25, Sandoval entered a Party Mania store on Mira Mesa Boulevard in which two clerks were working, Janie Vanderwaall and Devra Rapp. Sandoval was again wearing a hat, glasses, his Isotoner gloves, and had facial hair. Sandoval pointed the gun at Rapp's chest and demanded money, and both women gave Sandoval money from their cash registers. On March 9, Sandoval returned to the Party Mania store in the evening, while Rapp was in the back room and another clerk, Stacee Alexander, was in the front with customers. Sandoval pointed his weapon at a customer's child and then demanded money, after which Alexander gave Sandoval money from her register. Sandoval then ordered Alexander and the customer to the back of the store, and as they entered the back room Rapp recognized Sandoval. While Vanderwaall was uncertain, Alexander was "very sure" of her identification of Sandoval, and Rapp identified Sandoval at trial, and also identified Sandoval during the lineup and at the preliminary hearing.

### 9. La Jolla AM-PM attempted robbery/attempted murder

About 5 o'clock in the morning on January 29, Sandoval entered an AM-PM store on La Jolla Boulevard in which there was a clerk working alone, James Moore. Sandoval was again wearing his baseball cap and glasses, without the gloves or fake mustache, but with his black automatic

weapon. Sandoval pointed the weapon at Moore and demanded money. Moore began to comply, but then he slammed the register drawer shut and attempted to reason with Sandoval. Sandoval then fired into Moore's chest from a distance of about a foot, and left the store without any further attempt to obtain money. (At the time of trial the bullet remained in Moore's chest.) Moore identified Sandoval from a videotape of the lineup, and also at the preliminary hearing. A surveillance videotape of the incident was played for the jury.

The jury acquitted Sandoval of one shoe store robbery.

## B. *The Admissions*

### 1. *Pablo Cazares*[3]

Pablo Cazares was a coworker of Sandoval's. Sandoval told Cazares that he had committed many robberies, and asked Cazares if he wanted to be the "get away driver." Cazares and Sandoval laughed over a television report which pictured Sandoval committing one of the robberies. Sandoval also said he had shot a man in one robbery, and had forced pizza parlor employees into a back room. Sandoval said he changed clothing often to foil descriptions.

### 2. *Amado Olson*[4]

Sandoval told Amado Olson that he had committed many robberies in January and February 1992. Sandoval said he had shot a man in one robbery and thought he was dead, laughing about the shooting as he recalled it. Sandoval told Olson he liked to return and rob the same store again, to see the expressions on the faces of store personnel when they realized he had returned. Sandoval also wanted to return and again rob one pizza parlor.

## DISCUSSION

### I. *Exclusion of Evidence*

■■■■ Sandoval at trial presented the expert testimony of a clinical psychologist, who reviewed the application of many psychological research

---

[3]Cazares told San Diego Police Sergeant John Lusardi in June 1992 about his earlier conversations with Sandoval. At trial Cazares denied making these statements.

[4]Olson also told Sergeant Lusardi about conversations with Sandoval. At trial Olson also denied making many of these statements, as had Cazares. Olson did admit at trial that he had seen Sandoval with a gun, and that the gloves worn by a suspect in a photograph were Isotoner gloves which Olson had given to Sandoval, although Olson insisted that the person who was wearing the gloves in the photograph was not Sandoval.

studies to the question of eyewitness identifications, described instances of false eyewitness identifications, and commented upon those factors which might influence the accuracy of a lineup identification, such as in this case.

The psychologist also proposed to testify that the two lineups[5] conducted prior to trial in this case were unfair because (1) some of the persons in the first lineup were not viable alternative choices and (2) the videotape of the second lineup, which had been seen by the victims of the shoe store robbery (of which Sandoval was acquitted), showed Sandoval in the background for an inordinate time.

The court then sustained the People's objection to the proposed testimony, stating that the witness could testify as to the dynamics of eyewitness identifications in *general*, but on the question whether the *particular* lineups in this case were fair or unfair, "he's not an expert," and thus the psychologist was not permitted to so testify.

This ruling was correct. ▮ The fundamental rule is that "[w]hen an eyewitness identification of the defendant is a key element of the prosecution's case but is *not substantially corroborated by evidence giving it independent reliability*, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification, but are *not likely to be fully known to or understood by the jury*, it will ordinarily be error to exclude that testimony." (*People* v. *McDonald* (1984) 37 Cal.3d 351, 377 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011], italics added.) ▮ This case meets neither stated prong of the *McDonald* test for assigning error to exclusion of the testimony.

First, here the identity of Sandoval as the "Isotoner Bandit" was not only substantially but *fully* corroborated by Sandoval's own multiple revelations of his robbery career, complete with details linking him to specific offenses, and also by the fact the gloves the "Isotoner Bandit" wore were identified as having been given to Sandoval. In addition to this "external" corroboration of Sandoval's identity as the "Isotoner Bandit" the jury in this case was able to see several surveillance videotapes of robberies he committed, thus providing additional and very substantial "internal" corroboration of the witnesses' identification. Overall, this simply was *not* a case in which the multiple eyewitnesses' identification evidence was "not substantially corroborated by evidence giving it independent reliability." (*People* v. *McDonald*, *supra*, 37 Cal.3d at p. 377.)

As noted by our Supreme Court in a very similar case, "Although the trial court, under these circumstances, had discretion to admit [the proffered

---

[5]See footnote 2, *ante*.

expert's] testimony, we find no abuse of discretion, and clearly no prejudicial error, in its decision to exclude that evidence." (*People* v. *Walker* (1988) 47 Cal.3d 605, 628 [253 Cal.Rptr. 863, 765 P.2d 70]; cf. *People* v. *Alcala* (1992) 4 Cal.4th 742, 789 [15 Cal.Rptr.2d 432, 842 P.2d 1192]; *People* v. *Gaglione* (1994) 26 Cal.App.4th 1291, 1302-1305 [32 Cal.Rptr.2d 169]; and *People* v. *Johnson* (1993) 19 Cal.App.4th 778, 786-791 [23 Cal.Rptr.2d 703].) That holding applies here.[6]

Second, the assertion that three persons in one of the lineups were too dissimilar from the robber's description to constitute a fair selection is *not* a matter unlikely "to be fully known to or understood by the jury." The similarity in appearance of members of a lineup, relevant to the weight to be accorded an identification, is completely within the task of the trier of fact to resolve. On this point, as the trial judge noted, the witness was no more expert than any juror, and his opinion was thus properly excluded. (Cf. *People* v. *Wright* (1988) 45 Cal.3d 1126, 1141 [248 Cal.Rptr. 600, 755 P.2d 1049].)

In summary, (1) the offered opinion testimony did not require utilization of any expertise beyond that possessed by the jurors and the testimony was thus properly excluded; (2) there was much corroborating evidence in this case, and thus no need for expert testimony on the dangers inherent in eyewitness identification; and (3) in any event, on this record any possible error was necessarily harmless. For all of these reasons we reject Sandoval's argument.

## II. *Sentencing*

Sandoval makes numerous arguments about his sentencing. The main argument is that Penal Code[7] section 654 prohibits punishment both for the attempted robbery *and* the attempted murder of James Moore. Sandoval also argues he improperly received separate gun use enhancements for these offenses, and also improperly received an enhancement for the great bodily injury he inflicted in the attempted murder.

Sandoval additionally argues he should have received one-third of the middle term, rather than one-third of the upper term, for 12 of the gun use enhancements, and that imposition of the upper term for the gun use enhancements was improper in the first place. Sandoval goes on to argue

---

[6]Certainly in this case, in light of the massive amount of unchallenged evidence received, if it were error to have precluded the offered expert opinion, that error could not possibly have affected the result herein.

[7]Subsequent statutory references are to the Penal Code.

there was an impermissible dual use of facts in the choice of the aggravated term for the attempted murder and the upper term for the appurtenant gun use enhancement.

Sandoval returns to the attempted robbery/attempted murder area in arguing that consecutive sentences for these offenses, and in another instance where there were two victims in one store, were not supported by a proper statement of reasons. In what is almost an aside, Sandoval accuses the trial judge of "reasoning backwards" to justify imposition of the maximum possible sentence in this case. Sandoval last argues he improperly received an enhancement both for a prior prison term and a prior serious felony conviction. We address these sentencing arguments below.

### A.  *Attempted robbery and attempted murder*

■  The principal sentencing argument made by Sandoval is that section 654[8] prohibits his receiving separate sentences for his attempt to rob *and* his attempt to murder James Moore in the AM-PM market in the early morning hours of January 29, 1992. Sandoval insists "that both offenses emanated from just one indivisible course of conduct."

Sandoval insists that all his actions were undertaken pursuant to only one intent and objective, to obtain money. Thus, he argues, he should not be separately punished for the convictions (or receive separate gun use enhancements, addressed *infra*). We disagree with this assertion.

As the People have pointed out, this is essentially a fact-bound determination. The question of whether this was one offense or two separate offenses was argued below, and was resolved against Sandoval, and, as with other fact-bound questions, we will not disturb the determination made below unless it is unsupported by the evidence received.

Here, of course, the facts are fatal to the argument made by Sandoval. He had attempted to rob Moore, but Moore would not cooperate. While Moore did not attempt physically to resist Sandoval (being under the threat of Sandoval's weapon), he had refused to actually hand over the money. The attempted robbery was complete at this point.

It was only *after* this that Sandoval, from point blank range, determined for his own purposes to punish Moore, or to assuage his own thwarted

---

[8]In pertinent part, section 654 provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one . . . ."

desires by seeking other and different gratification, by firing directly into Moore's chest. (As the trial judge noted, Sandoval fired "with absolutely no provocation and shot [Moore] directly in the chest in an attempt to hit his heart to kill him.")

In these circumstances the rule has been clearly set out in a decision by Division Three of this District: "[A] separate act of violence against an unresisting victim or witness, whether gratuitous or to facilitate escape or to avoid prosecution, may be found *not* incidental to robbery for purposes of section 654." (*People* v. *Nguyen* (1988) 204 Cal.App.3d 181, 193 [251 Cal.Rptr. 40], italics added.)

### B. *Gun use enhancements, attempted robbery and murder*

■    Sandoval next argues, relying on *In re Culbreth* (1976) 17 Cal.3d 330 [130 Cal.Rptr. 719, 551 P.2d 23],[9] that it was improper to impose separate gun use enhancements for the attempted robbery and the attempted murder. The flaw in his argument is that it assumes that both offenses are indivisible, and, as we have noted above, this assumption is incorrect. Where offenses are separately punishable, the gun use enhancements for each offense may be separately imposed. (*People* v. *Levitt* (1984) 156 Cal.App.3d 500, 511 [203 Cal.Rptr. 276].) There was no error in this respect.

### C. *Gun use and great bodily injury enhancements*

■    As the trial court noted, Division Three of this district has construed the language of section 1170.1, subdivision (e) as allowing application of both gun use and great bodily injury enhancements in cases of "attempted . . . murder." (*People* v. *Calderon* (1991) 232 Cal.App.3d 930, 939-940 [283 Cal.Rptr. 833].) Sandoval does not dispute this, but argues imposition of both gun use and great bodily injury enhancements is a sentencing choice for which reasons must be stated, citing *People* v. *Reiley* (1987) 192 Cal.App.3d 1487, 1490 [238 Cal.Rptr. 297]. The People assert Sandoval's failure to raise this point in the trial court has waived his right to appellate review.

We need not address the question of waiver, but will assume that the imposition of both enhancements does, as the cited case holds, require a statement of reasons. Here, however, (1) the prefatory comments of the court

---

[9]*Culbreth* has been overruled by *People* v. *King* (1993) 5 Cal.4th 59, 79 [19 Cal.Rptr.2d 233, 851 P.2d 27]. The offenses herein were committed prior to the *King* decision, however, and the rule of law announced therein is not retroactive. (*Id.* at pp. 79-80.)

prior to sentencing adequately explain the court's reasoning,[10] and (2) "where the sentencing court fails to state such reasons, remand for resentencing is not automatic; we are to reverse the sentence only if 'it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error.' [Citations.]" (*People v. Sanchez* (1994) 23 Cal.App.4th 1680, 1684 [29 Cal.Rptr.2d 367].) Here, there is no such probability. A review of this record leads instead to the conclusion that the imposition of both the gun use and great bodily injury enhancements, permissible under the law, would again be done at resentencing, for which there is thus no necessity.

### D.   *Gun use enhancements*

Sandoval makes several related points about imposition of the gun use enhancements. We proceed to discuss them.

### 1.   *Selection of upper term*

█   Sandoval urges that the reason for imposition of the upper term for the gun use enhancements was the same as the reason for application of the enhancement at all (that is, Sandoval pointed his gun at various victims), and thus there was an impermissible dual use of facts in this sentencing.

Not so. The gun use enhancement is applicable to all uses of a weapon, from the most "benign" display to the most heinous confrontation. The trial judge found the manner in which Sandoval used his weapon went beyond the "ordinary" or normative usage of a weapon: "[T]he weapon was pointed at the victims and on occasion at the witnesses. Often in the course of those incidents [Sandoval] would emphasize the presence of the weapon by threatening to kill the victim if he or she did not comply. [¶] Therefore, I adopt the argument of the prosecution and will impose the upper term of one year, eight months, one-third the maximum term of five years, for each [section] 12022.5 enhancement."

---

[10]After setting out the many reasons the statutorily ineligible Sandoval should not receive probation, the court noted as aggravating factors the threats of and infliction of great bodily injury, the cruelty and callousness of the maiming, the vulnerability of Sandoval's usual victims, the sophisticated and professional manner in which Sandoval planned and committed these crimes, the fact his violent conduct constituted a grave danger to society, the growing number and increasing severity of Sandoval's adult convictions, and the fact Sandoval was on parole at the time of these offenses.

The court then addressed the recommendation that all convictions receive separate and consecutive sentences, and set out many factors underlying the court's agreement with this recommendation, including the fact the crimes were all separate incidents with independent objectives (except for the robbery of two persons in the first Party Mania robbery) and all involved separate acts of violence.

These reasons are distinct from the usage of the gun to support imposition of the enhancement in the first place. It requires no extensive discussion to comprehend the reason for selection of the upper terms in this case: Sandoval took great care to exploit the usage of his firearm to instill in his victims more than the requisite fear for their lives.

Such actions as specifically threatening to kill, *in addition* to the use of the weapon as the "force" by which money was demanded, and such extreme terrorizing as pointing the gun at a child bystander to enforce compliance, more than adequately support the trial judge's imposition of the upper term for each instance of the gun usage by Sandoval.

### 2. *One-third of midterm or upper term*

■ Sandoval also argues ". . . the Legislature inadvertently failed to update section 1170.1, subdivision (a) to reflect the changes it made some twelve years later to section[] . . . 12022.5." He then argues there is no authority for imposition of one-third the upper term rather than one-third of the midterm for subordinate gun use enhancements to be derived from section 1170.1, subdivision (a)'s language, which clearly states the term imposed "shall include one-third of any enhancements imposed pursuant to Section . . . 12022.5."

We disagree. The plain meaning of the language is readily reconciled with the proposition that the Legislature meant exactly what it said. The trial court here sentenced just as is mandated by section 1170.1, subdivision (a). There was no error.

### 3. *Dual use of facts, offense and enhancement*

■ Sandoval also attacks imposition of the aggravated term for the attempted murder and the upper term for the gun use enhancement on that charge, arguing that the "high degree of cruelty and callousness" of Sandoval in attempting to murder Moore (Cal. Rules of Court, rule 421(a)(1)) was the same fact used for selecting the upper term for the gun use.

We cannot agree. The "high degree of cruelty and callousness" cited by the trial judge in selecting the upper term for the attempted murder is *not* identical to the fact that the manner in which Sandoval used his weapon was "with absolutely no provocation" and that Sandoval "shot [Moore] directly in the chest in an attempt to hit his heart to kill him." As respondent People

point out, a gun use enhancement is properly imposed even where the weapon is not fired. Necessarily, where the weapon is discharged at point blank range directly into a victim's chest, the manner of gun use is itself aggravated, and it was not error for the trial court to so find.

Finally, even if it were necessary to parse out more distinctly the differing rationales for the trial court's selection of the aggravated term for the attempted murder and the upper term for the gun usage, as we have earlier noted, "where the sentencing court fails to state such reasons, remand for resentencing is not automatic; we are to reverse the sentence only if 'it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error.' [Citations.]" (*People* v. *Sanchez, supra*, 23 Cal.App.4th at p. 1684.) There is *no* "reasonably probable" more favorable result here.

### E. *Reasons for consecutive sentences*

█ Sandoval also urges that the "separate incidents and separate victims" rationale relied upon for the imposition of consecutive sentences is invalid with respect to (1) the attempted murder/attempted robbery, and (2) the one robbery with two victims (the first Party Mania robbery). Not so.

As extensively discussed above, the attempted robbery was complete at the time Sandoval independently determined to punish Moore for his obduracy by attempting to murder him in a direct, exacting and brutal manner. Thus consecutive sentences for these offenses were proper under the stated rationale, contrary to Sandoval's assertions.

Also, the imposition of consecutive sentences for the two separate victims of the first Party Mania robbery, if not an example of independent objectives, is still fully supportable under the rationale the young women victims were particularly vulnerable (an aggravating circumstance recited by the trial judge). Again, a remand for a resentencing would, on this record, be a wholly idle act, as the record is replete with adequate reasons for selection of the terms imposed, and no other result is reasonably (or even rationally) likely in the event of a remand. (See, e.g., *People* v. *Edwards* (1993) 13 Cal.App.4th 75, 79-80 [16 Cal.Rptr.2d 572].)

### F. *Prior prison term/prior serious felony*

█ Sandoval also argues the imposition of both a section 667, subdivision (a) prior serious felony five-year enhancement and a section 667.5,

subdivision (b) prior prison term one-year enhancement was prohibited, citing *People* v. *Jones* (1993) 5 Cal.4th 1142 [22 Cal.Rptr.2d 753, 857 P.2d 1163]. *Jones* precluded imposition of both enhancements for a one-offense prison commitment. (*Id.* at p. 1153.) This case, however, does not involve two enhancements for one offense. Sandoval's first prior prison term was *both* for his conviction of a (serious felony) burglary *and* for a wholly separate conviction of grand theft. In confronting a procedurally indistinguishable case last year this court held that "a concurrent prison sentence imposed for two separate crimes, *one* of which was a serious felony prior . . . does not preclude imposition of the . . . one-year enhancement for the . . . prior prison term allegation." (*People* v. *Gonzales* (1993) 20 Cal.App.4th 1607, 1610 [25 Cal.Rptr.2d 305].) The present case is fully within the ambit of *Gonzales*, and we thus reject Sandoval's argument.

### G. *"Reasoning Backwards"*

Sandoval (as noted earlier) also makes an attack on the trial judge, accusing him of having "reasoned backward" in the selection of the terms imposed in this case. That is, Sandoval accuses the court of having selected a particular length of total term and then worked backward to rationalize the selected number in making sentencing choices.

The point is specious. It is true the judge remarked the case called for the court "to aggravate [the sentence] as much as possible, not to punish Mr. Sandoval any more than is necessary, but to protect society, which is obviously called for here to the highest extent." These remarks do not, however, indicate that a particular sentence length had been chosen, which was only then to be somehow *post facto* justified.

Rather, the statement just cited merely reflects the agreed view among all parties below that this was a very serious case.[11] Sandoval was willing to spread twice-daily armed terror among vulnerable people, often traumatizing his victims in a devastating and long-lasting way. Also, except for what the trial judge termed the "miracle" of Moore's survival, this could well have been a death penalty case.

Simply put, there is nothing in this record except fate to exempt Sandoval from the most extreme penalty, as there is no way to distinguish Sandoval's

---

[11]While the district attorney had recommended a total term of 54 years, and the probation report had suggested a 50-year, 8-month term, even Sandoval's trial counsel, affording him every favorable interpretation of the rules, suggested a 25-year prison term be imposed on him.

intentional acts from those of the most severely punished class of felons. (As the trial judge also noted, while Moore's body may have survived his encounter with Sandoval, Moore was "emotionally dead.") The sentencing court properly appreciated the extreme danger presented by someone who not only committed armed robberies for (on average) less than $100 amounts, but who also clearly enjoyed the terror inflicted on his victims and even looked forward to repeating his terrorizing of the same victims, and who was willing to kill to punish disobedience. The facts of this case, rather than *a priori* assumptions, supported the trial court's decision "to aggravate [the sentence] as much as possible, not to punish Mr. Sandoval any more than is necessary, but to protect society, which is obviously called for here to the highest extent."

The trial court also noted and properly agreed with the probation report's very apt description of the matter: "The aggravating factors in this case are numerous, while the mitigating factors appear nonexistent."[12]

In light of the fundamental fact that it was Sandoval, by his determination to commit very many and very serious offenses in a very aggravated manner, who created the facts supporting his sentencing, there is no reason to indulge in speculation that the court might somehow have acted in an improper manner in computing the sentences to be imposed, when nothing in the record supports that assertion. The contention urged by Sandoval here is without merit.

### III.  *CALJIC No. 2.90*

Sandoval's final argument is that the instruction on reasonable doubt violated his due process rights. The United States Supreme Court has recently rejected this contention, as we also must. (*Sandoval* v. *California* (1994) __ U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239].)

---

[12]Sandoval also quarrels with the manner in which the trial judge listed many of the aggravating factors and many of the factors supporting consecutive sentences, but not necessarily relating each factor to a specific offense. (See, e.g., fn. 10, *ante.*) Sandoval asserts "[c]reating a 'factor bank,' as the court did here, makes appellate review extremely difficult in a multiple offense case" and "sentencing errors become difficult to challenge." To the contrary, it is Sandoval, a recently paroled armed robber who was willing to terrorize children, to steal from charitable donations, and also to kill to enforce his will, who has created a record featuring a great number of aggravating factors, while presenting no factors whatsoever in mitigation. There was no impropriety in the sentencing procedure employed herein.

## DISPOSITION

The judgment is affirmed.

Huffman, Acting P. J., and Di Figlia, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied February 23, 1995. Mosk, J., was of the opinion that the petition should be granted.

---

*Judge of the San Diego Superior Court sitting under assignment by the Chairperson of the Judicial Council.