Filed 1/30/14  P. v. Lovest CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B244651 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA076543) |
| v. | |
| ANTWONE MARKEYS LOVEST, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Janice Claire Croft, Judge.  Affirmed as modified and remanded with directions.

Jean Ballantine, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Jonathan J. Kline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In an information filed by the Los Angeles District Attorney, defendant and appellant Antwone Markeys Lovest was charged with kidnapping to commit robbery (count one; Pen. Code, § 209, subd. (b)(1)),[1] robbery (count two; § 211), criminal threats (count three; § 422), burglary (count four; § 459), and grand theft (count seven; § 484e, subd. (d)). As to counts one through three, it was further alleged that appellant personally used a deadly and dangerous weapon in the commission of the offenses within the meaning of section 12022, subdivision (b)(2). Appellant pleaded not guilty and denied the special allegation.

Trial was by jury. The jury found appellant guilty of counts two, three, four, and seven, but was unable to reach a verdict on count one. It found the deadly weapon allegation true as to counts two and three. Retrial on count one was by jury. On retrial, the jury found appellant guilty on count one and found the section 12022, subdivision (b)(1), allegation to be true.

The trial court denied probation and sentenced appellant to life in state prison plus five years eight months. The sentence was composed of a life term on count one plus one year for the weapon enhancement, a consecutive three-year term on count two plus one year for the weapon enhancement, and a consecutive eight-month term on count seven. Appellant was ordered to pay restitution and assessments. He was granted 1,250 days of presentence custody credit.

Appellant timely filed a notice of appeal. On appeal, he argues: (1) Section 654 requires a stay of sentence on counts two, three, and seven because all of the offenses were within a single, continuing course of conduct for the single purpose of taking money from the victim; (2) The sentencing in violation of section 654 violates his right to due process and the prohibition against double jeopardy; (3) The trial court erred in denying an award of presentence conduct credits; (4) The trial court's imposition of a $240 restitution fine and a $240 parole revocation fine reflects an intent to impose the

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

2

minimum fines; because the statutory minimum at the time of the offense was $200, the fines must be corrected.

We agree with the parties that appellant's sentence on count two must be stayed. We also agree that appellant should have been awarded 1,438 days of presentence custody credit. Therefore, we correct the sentence. Upon remand, we direct the trial court to modify the abstract of judgment to stay appellant's sentence on count two and award him 1,438 days of presentence custody credit. In all other respects, the judgment is affirmed.

## FACTUAL BACKGROUND

I. *First Trial*

A. Prosecution Evidence

On March 31, 2009, Kyle Chang (Chang) arrived at Almansor Park in Alhambra. As Chang listened to the radio in his car, appellant approached him and asked for the time. Chang told him that it was a quarter to four. Chang heard appellant say, "'Where are th[o]se guys?,'" as if he was waiting for someone. Appellant then walked away.

When Chang exited his car, appellant was standing near the rear of his car with a gun drawn. He ordered Chang back into the vehicle. Appellant got into the backseat and calmly ordered Chang to drive. Chang exited the parking lot and turned south on Almansor Street. Appellant told Chang to give him his wallet and cell phone. Fearing for his life, Chang complied. Appellant looked through Chang's wallet and asked if his name was Kyle. When Chang responded in the affirmative, appellant asked him for his ATM pin. Chang told appellant that he did not know it. Appellant accused Chang of lying.

Appellant directed Chang to turn east on Valley Boulevard, south on New Avenue, east on Garvey Avenue, and south on Rosemead Boulevard. He then directed Chang to take the 60 Freeway east, telling him that he needed to go to the hospital. Appellant said that he was sick. When Chang asked him which hospital he wanted to go to, appellant told him to "shut up and drive." He asked Chang for his pin multiple times, but Chang maintained that he did not know it. Appellant told Chang that they were "just going to

3

keep driving until [he] remember[ed]." Mentioning Chang's address, appellant told Chang that he had better remember the pin or he would go to Chang's house and hold his family hostage. He asked Chang what he did for a living and how much money was in his bank account.

Appellant directed Chang to go south on the 605 Freeway, and then south on the 5 Freeway. Appellant threatened to "blow [Chang's] brains out." He told him, "'Good thing you speak English because the last guy didn't, so I had to shoot him in the leg.'" At appellant's direction, Chang exited the freeway and drove south on Brookhurst Street. Appellant was becoming more upset that Chang was not giving him his pin. He told Chang that he was going to "hog tie" him and "have some of his homies have fun with [him]."

Chang tried to drive recklessly to draw attention to himself. Appellant told Chang that he was not a good driver. When Chang suggested that appellant drive, appellant told him that he could not because he had a suspended license. Appellant tried to dial a number on Chang's phone. He told Chang that he had a lousy cell phone and that, if he made it "'out of this alive,'" he should get a new one. When they reached Bixby Avenue, appellant instructed Chang to make a U-turn.

As they were traveling north on the 5 Freeway, appellant called the customer service number on Chang's American Express credit card. Appellant told the customer service representative that his friend needed his pin. The representative told appellant that he needed to speak directly to Chang. As appellant held the phone to Chang's ear, he answered the representative's security questions. Chang authorized appellant to speak to the representative on his behalf. As Chang drove north on the 605 Freeway, a new pin was created.

Appellant directed Chang to drive west on the 10 Freeway and then to exit at Peck Road. He drove south on Peck Road and west on Elliot Avenue. Still on the phone with the customer service representative, appellant told Chang to pull to the side of the street. After doing so, Chang opened the door and ran. He tried to flag down passing cars. He

4

banged on their windows until a woman stopped. He explained to her what had happened and she drove him to the El Monte Police Department. There, he spoke to detectives.

That evening, someone using Chang's American Express credit card was given a cash advance at an ATM on Santa Anita Avenue in El Monte. Ten minutes later, another attempt was made to withdraw money at an ATM on Rosemead Boulevard in Rosemead.

On April 20, 2009, police went to the home of appellant's father in Upland. Appellant had been living there for several weeks. Police recovered a BB gun in a laundry basket that was identified as belonging to appellant. The BB gun was a replica of an actual firearm. According to Alhambra Police Detective James Hammond, a projectile fired from the gun could break the skin or cause permanent damage to a person's eye.

B. Defense Evidence

According to appellant's father, appellant began having mental health problems at the age of 9. He began using drugs at around the age of 16. Appellant's mother also suffered from mental health issues, having been diagnosed as bipolar. She was hospitalized on one occasion for her mental illness. Appellant was placed in foster care when he was 14 after a fight with his stepmother. This experience caused appellant's mental health to deteriorate. He was diagnosed with schizophrenia at the age of 17.

Psychiatrist Gordon Plotkin evaluated appellant. Appellant had abuse in his history. He developed a mental illness in 2002. He was hospitalized for psychiatric reasons on six occasions. He was homeless for a period of time and used methamphetamine. As time went on, appellant developed manic symptoms—insomnia, paranoia, and hallucinations. He was diagnosed with bipolar disorder, schizoaffective disorder, substance-abuse psychotic disorder, and paranoid schizophrenia. He was initially treated with anti-depressants, but when his psychiatric symptoms became more pronounced, he was prescribed anti-psychotic medications. He hears the voice of the person who molested him (his mother's boyfriend). He suffered the molestation at a young age. He was placed in foster care and then sent to hospitals for evaluation.

In his interview with Dr. Plotkin, appellant stated that he had a history of experiencing hallucinations when he went off his medications. Prior to the crime in this

5

case, appellant had been off his medication for several days and had been using methamphetamine for five consecutive days. He was sleepless, paranoid, hearing voices, and disorganized in his thinking. He believed that people were looking for him. The voices provided appellant with a running commentary that justified the paranoia he was feeling.

Appellant's CT scan was abnormal; it showed that his brain had atrophied. Appellant told Dr. Plotkin that, at the time of the incident with Chang, he was seeking medical help. The use of methamphetamine amplifies a person's psychotic symptoms. In Dr. Plotkin's opinion, at the time of the incident, appellant was suffering from a major mental disorder—probably bipolar disorder, but possibly schizophrenia. It also could have been schizoaffective disorder or substance-induced psychotic disorder. In the past, when appellant reached this psychological state, he would go to the hospital. Appellant was likely not thinking lucidly when he ordered Chang into the car. Appellant would have had trouble thinking rationally.

II. *Retrial*

The evidence presented at the retrial largely mirrored the evidence presented at the first trial, except that appellant and his wife, Rosalba Lovest (Rosalba), testified at the retrial. Rosalba met appellant in 2001 when she was 16 years old. They attended the same high school. They developed a relationship in 2001 and began living together in 2003. Rosalba last lived with appellant in 2008.

When they lived together, Rosalba noticed that appellant had mental health problems. He was aggressive and suffered from nightmares. He was so scared of the dark that he would urinate outside their bedroom because he did not want to walk into the bathroom. On one occasion, appellant was caring for his mother and suffered a breakdown. Rosalba found him in the shower with cuts to his forearms.

In November 2008, after they separated, appellant called Rosalba and told her that he was hearing voices and that the voices were telling him to kill himself. She took him to the hospital. He was subsequently transferred to a "psyche ward." On one occasion in January 2009, Rosalba took their son to visit appellant. Appellant screamed, "'He's

6

coming,'" and threw them to the floor. He told them that "Marshall" (the name of mother's boyfriend who molested appellant) wanted to hurt him again and that he was coming after them.

Appellant testified that on March 31, 2009, he walked home from El Monte to Almansor Park. He was trying to "lose" someone that was following him. He had used methamphetamine on two occasions that day, and he had been using it for the prior four days as well. He was hearing voices, one of which was Marshall's voice. He started hearing voices after Marshall molested him at age 6. Appellant always felt like Marshall was after him. After he was molested, appellant moved to his father's house, but his father began to hit him. He was placed in foster care at age 9.

Appellant used methamphetamine on the day of the incident because he was paranoid; he wanted to stay awake and watch everything. He arrived at Almansor Park at around 3:00 p.m. He wanted to go to a crowded area. He was carrying the BB gun because he had been robbed on an earlier occasion. When he saw Chang, he was hearing voices and high on methamphetamine. He wanted to go to the hospital because he was high and the voices were "screaming in [his] head." Earlier that day, appellant had gone to a mental health facility and said that he was hearing voices and that he was high. The facility told him to go to a hospital.

At the time appellant asked Chang for the time, he felt that people were closing in on him. He told Chang to get into the car because he (appellant) wanted to leave California. He felt that his life was in danger, and he was going to use Chang's money to leave the state. Appellant also wanted to go to Rosemead Ingleside Hospital. He threatened Chang when he learned that Chang had lied to him about being a doctor. He also threatened Chang because it was "a life and death situation"; he needed to leave California. The voices were telling appellant to get away.

Appellant withdrew the $200 from the ATM on Santa Anita to give to his friend so that his friend would drive him to Arizona. Appellant did not kidnap Chang for the purpose of robbing him; he was trying to go to a hospital. He was not in his normal

7

mental state. After the incident with Chang, appellant decided to "get clean." He called his father, who invited him to live with him in Upland.

## DISCUSSION

I. *The sentence on count two must be stayed; section 654 does not require that the sentences on counts three and seven be stayed*

Appellant argues that section 654 required that his sentences on counts two, three, and seven be stayed because all of the offenses were within a single, continuing course of conduct for the single purpose of taking money from Chang.

### A. Relevant proceedings

On count one (kidnapping to commit robbery; § 209, subd. (b)(1)), the trial court sentenced appellant to life in state prison plus an additional year for the deadly weapon enhancement. On count two (robbery; § 211), the trial court imposed a consecutive three-year sentence plus an additional year for the deadly weapon enhancement. On count three (criminal threats; § 422), the trial court imposed a concurrent three-year sentence plus an additional year for the deadly weapon enhancement. And on count 7 (theft of access card information; § 484e, subd. (d)), the trial court imposed a consecutive eight-month term.

### B. Applicable law

Section 654 prohibits punishment for two offenses arising from a single, indivisible course of conduct. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208; *People v. Perry* (2007) 154 Cal.App.4th 1521, 1525.) If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may only be punished once. (*People v. Latimer*, at p. 1208; *People v. Perry*, at p. 1525.) However, if a criminal defendant has several independent criminal objectives, he may be punished for each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct. (*People v. Latimer*, at p. 1208; *People v. Perry*, at p. 1525.)

"[M]ultiple crimes are not one transaction where the defendant had a chance to reflect between offenses and each offense created a new risk of harm," and separate

8

sentences may be imposed on offenses that are divisible in time. (*People v. Felix* (2001) 92 Cal.App.4th 905, 915.) Even if acts are committed pursuant to a single objective, section 654 does not prohibit multiple punishment if the acts are "temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.) The question of whether the defendant harbored a "single intent" is a factual determination made by the trial court. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) On appeal, the trial court's factual determination must be sustained if supported by substantial evidence. (*People v. Perry*, *supra*, 154 Cal.App.4th at p. 1525.)

C. The sentence on count two must be stayed

The People agree that appellant's sentence on count two should have been stayed. To commit the kidnapping for robbery of which appellant was convicted in count one, appellant (obviously) needed to intend to rob Chang. (CALCRIM No. 1203.) Because the kidnapping for robbery (count one) and the robbery (count two) were committed for the same objective, sentence on the robbery conviction should have been stayed pursuant to section 654. (*People v. Lewis* (2008) 43 Cal.4th 415, 519.)

D. Sentences were properly imposed on counts one and seven because appellant had an opportunity to reflect and renew his intent before acquiring Chang's access card information

However, substantial evidence supports the trial court's refusal to apply section 654 to counts one and seven. *People v. Lopez* (2011) 198 Cal.App.4th 698 is instructive. In that case, the defendant stole the victim's purse and used her credit card to make a purchase at a convenience store. (*Id*. at p. 705.) He received concurrent sentences for theft of personal property and using the stolen access card. (*Id*. at p. 702.) On appeal, the defendant argued that his sentence for using the stolen access card should have been stayed pursuant to section 654 because both offenses involved the same indivisible course of conduct. (*People v. Lopez, supra,* at pp. 701–702, 716–717.) The Court of Appeal disagreed, explaining that "the amount of time that it took for [the defendant] to drive to the 7-Eleven, park the car, and walk into the store was sufficient for him to reflect upon

9

what he had already done (stolen [the victim's] purse and its contents including the access card) and what he was about to do (use the access card to obtain merchandise)." (*Id*. at p. 718; see also *People v. Louie* (2012) 203 Cal.App.4th 388, 399; *People v. Clair* (2011) 197 Cal.App.4th 949, 960.)

Here, appellant demanded Chang's wallet and cell phone as Chang was backing out of the parking spot in the Almansor Park parking lot. One to two minutes later, appellant asked Chang what his name was. And, "after that," appellant asked for Chang's pin, which Chang did not know. Appellant did not acquire the final piece of Chang's access card account information (the new pin) until after they had driven to Orange County and were on their way back. During that journey, appellant had sufficient time to reflect on what he had done (kidnapped and robbed Chang and forced him to drive dozens of miles through two counties) and renew his intent before demanding that Chang create a new pin for him to use. This is especially true given the fact that appellant and Chang discussed multiple topics (sports, their families, their high schools, Chang's lack of sexual experience) unrelated to appellant's crimes during the drive. Because appellant's acquisition of Chang's access card account information was divisible in time and place from his robbery and kidnapping of Chang, substantial evidence supported the trial court's imposition of sentences on both counts one and seven.

E. Sentences were properly imposed on counts three and seven because appellant harbored independent criminal objectives in committing those offenses

Similarly, substantial evidence supports the trial court's refusal to apply section 654 to counts three and seven. Appellant's claim on appeal that he threatened Chang for the purpose of obtaining his access card account information is supported by the record. But, the record also supports a finding that appellant issued the threats for a separate, independent criminal purpose—to punish Chang for lying to him about being a doctor. Appellant so testified, and the testimony of a single witness constitutes substantial evidence. (*People v. Mejia* (2007) 155 Cal.App.4th 86, 93.) Because appellant's efforts to obtain Chang's money and his threats to Chang did not arise from a single objective,

10

imposition of sentence on both counts three and seven did not violate section 654. (*People v. Sandoval* (1994) 30 Cal.App.4th 1288, 1299–1300.)

    F.  <u>Sentencing did not violate the federal Constitution</u>

Appellant argues that the sentences imposed in violation of section 654 violate his right to due process and the Fifth Amendment's prohibition against double jeopardy. In light of our conclusion that appellant's sentence did not violate section 654, it necessarily follows that there was no constitutional violation. (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.)

II. *Appellant is entitled to additional presentence custody credits*

Appellant argues that the trial court erred in denying him an award of presentence custody credits and miscalculated his actual days of presentence confinement. The People agree.

It appears that the trial court failed to recognize that 2012 was a leap year. Thus, appellant is entitled to 1,251 actual days of credit, instead of 1,250 days.

Furthermore, the trial court refused to award appellant presentence conduct credits because he received a life sentence. However, "neither section 2933.1 nor section 4019 contains any express provision making defendants ineligible for presentence conduct credit if they receive an indeterminate life sentence." (*People v. Brewer* (2011) 192 Cal.App.4th 457, 462.) Because appellant was convicted of violent felonies, his presentence conduct credit is limited to 15 percent of his actual days of presentence confinement. (§§ 667.5, subds. (c)(9) & (c)(14); 2933.1, subd. (a).) Thus, he should have been awarded 187 days of conduct credit, for a total presentence credit award of 1,438 days.

III. *Appellant's claim that the trial court erred in its imposition of the restitution and parole revocation fines has been forfeited and is without merit*

In March 2009, when appellant committed his crimes, section 1202.4, subdivision (b)(1), provided for a minimum restitution fine of $200 for a person convicted of a felony. Section 1202.45 required (and still requires) the trial court to impose a parole revocation fine "in the same amount as" the restitution fine imposed under section

11

1202.4, subdivision (b). The Legislation authorizing an increase in the amount of the minimum restitution fine under section 1202.4, subdivision (b)(1), from $200 to $240 became effective on January 1, 2012, after the commission of appellant's crimes. (*People v. Kramis* (2012) 209 Cal.App.4th 346, 349–350, fn. 2.)

Appellant argues that the trial court's imposition of a $240 restitution fine and a $240 parole revocation fine reflects an intent to impose the minimum fines; because the statutory minimum fines at the time of the offense were $200 each, the fines imposed violate ex post facto principles and must be corrected.

Appellant did not raise this issue with the trial court. As such, it has been forfeited on appeal. (*In re Sheena K.* (2007) 40 Cal.4th 875, 880–881; *People v. White* (1997) 55 Cal.App.4th 914, 917 [the rule of forfeiture applies to ex post facto claims].) Our analysis could stop here.

For the sake of completeness, we note that appellant's claim lacks merit. A law violates the ex post facto clause if it inflicts a greater punishment for the crime than was available when the crime was committed. (*In re Robert M.* (2013) 215 Cal.App.4th 1178, 1186.) Here, there was no ex post facto application of section 1202.4, subdivision (b)(1), because the trial court had the discretion (in 2009 and in 2012) to impose a restitution fine up to $10,000; thus, appellant was not subjected to increased punishment when the sentencing court ordered him to pay $240.

Appellant's argument notwithstanding, there is no evidence in the appellate record that the trial court misunderstood the law or intended to impose the statutory minimum fine (which would have been $200). The trial court never said that it was imposing the minimum restitution fine; the fact that it selected $240 without comment does not compel the conclusion that the trial court intended to impose anything other than that amount.

12

## DISPOSITION

The judgment is affirmed as modified.  The matter is remanded to the trial court with directions to amend the abstract of judgment to reflect that appellant's sentence on count two is stayed and that he is awarded 1,438 days of presentence custody credit.  In all other respects, the judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
          ASHMANN-GERST


We concur:


_____, J.
     CHAVEZ


_____, J.*
     FERNS

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13