Filed 5/19/15  P. v. Tellez CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE RAUL TELLEZ, JR.,<br><br>    Defendant and Appellant. | 2d Crim. No. B252116<br>(Super. Ct. No. 2012045100)<br>(Ventura County) |

Jose Raul Tellez, Jr., appeals after a jury convicted him of home invasion robbery (Pen. Code,[1] § 459), false imprisonment by violence (§ 236), and possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)).  The jury also found true allegations that the robbery was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(B)), and that a principal personally used a firearm (§§ 12022, subd. (a)(1), 12022.53, subds. (b), (e)(1)).  The trial court sentenced him to 20 years in state prison.  Appellant contends he was sentenced in violation of section 654 and that the gang enhancement must be reversed for insufficient evidence.  We affirm.

---

[1] All further undesignated statutory references are to the Penal Code.

STATEMENT OF FACTS

In May 2012, appellant was an associate of Oxnard's North Side Chiques (NSC) gang. On May 23rd, appellant met with NSC members Robert Zamudio and Eric Jones to discuss robbing Joe Vaca. Appellant had known Vaca for over 10 years and bought marijuana from him. Appellant and his girlfriend Renee Keefover, whom Vaca introduced to appellant, also occasionally visited Vaca at his house in El Rio. Appellant knew that Keefover and Vaca had recently had lunch together and had smoked marijuana.

Appellant told Zamudio and Jones that Vaca always had a lot of marijuana or methamphetamine and that robbing him would be easy because he lived in a sparsely populated area.[2] Appellant led Zamudio to believe he had a personal dispute with Vaca. They all agreed that NSC associate Michael Majeno would also participate in the crime.

Appellant, Zamudio, and Jones bought latex gloves and drove a truck to Majeno's house to pick him up. Zamudio and Jones wore bandannas on their faces and Majeno donned a black ski mask. They then drove to Vaca's house with appellant giving directions. Appellant told the other men he would wait outside and act as lookout because Vaca might recognize him.

Vaca was asleep in the house along with his eight-month-pregnant girlfriend Mary Rydberg and her five-year-old son Kingston. Zamudio armed himself with the .357-caliber revolver, knocked on the front door, and woke up Vaca. Before opening the door, Vaca asked who it was. Zamudio identified himself as "Taylor's friend" and said his name was "Brandy." Vaca slightly opened the door and Zamudio and Jones tried to force it open. Majeno was armed with a shotgun and pointed it into the house. After a struggle, the door broke off its hinges and the three men rushed in.

Jones was armed with a rifle and forced Vaca to the ground. Rydberg grabbed her son and ran to his bedroom. Vaca was told not to move or he would be

---

[2] Zamudio testified for the prosecution in exchange for use immunity and leniency. He pled guilty to the robbery and was allowed to withdraw his admission of the firearm use allegation. He agreed to cooperate with the police because he had "accepted the Lord as [his] Savior" and wanted out of the gang lifestyle.

killed. The men demanded to know where Vaca kept his drugs and money. Vaca directed them to a car that was parked outside. When Majeno searched the car, its alarm went off. After finding an eighth of an ounce of marijuana in the car, Majeno returned to the house and asked Vaca, "This is it?" Majeno told Vaca they would kill him if they found anything else in the house. One of the men took Vaca's wallet and cell phone. Vaca was told to crawl to the bathroom about 25 feet away and get in the bathtub. After he did so, the three men ran out of the house and fled in their truck. Rydberg called 911.

Zamudio had taken an Xbox and a laptop computer from Vaca's house. The men also took a half-ounce of marijuana, Vaca's wallet containing $200, and Rydberg's identification and social security cards. Zamudio and Jones both told appellant they had left their latex gloves in Vaca's house. Appellant drove the men to his house, where they discussed how to divide the robbery proceeds. The rifle and shotgun were returned to Jones, and the revolver was returned to Majeno. Keefover drove Zamudio, Jones, and Majeno home in her car.

The major contributors of DNA found on a glove and a piece of a glove recovered from Vaca's house matched Jones and Zamudio's genetic profiles. Jones was subsequently arrested and transported to the county jail.

Detective Jarrod Foote learned of Keefover's involvement and interviewed her in December 2012. A recording of the interview was played for the jury and a transcript of the interview was provided. Keefover said she was at appellant's house on the day of the robbery when she heard him speaking "secretively" with Jones, who was carrying a rifle or shotgun. Sometime before midnight, she was driving toward appellant's house when he asked her to drive two of his friends home. As she was doing so, one of the friends told her how they had made some girl cry. Later that night, appellant told Keefover "we hit Joe's house" and "we did a home invasion." Appellant told Keefover that he committed the crime because he was jealous and said, "no one has lunch with my girl."

3

The day after Keefover's interview, Detective Foote and other officers picked Zamudio up from custody in Adelanto. During the return drive to Ventura, Zamudio described how the robbery was planned and executed and named those who were involved. The information Zamudio provided matched the evidence that had been obtained at that point in the investigation. Zamudio also led them to Vaca's house, the homes of Jones and Majeno, and the store where the truck used in the robbery had been parked. Zamudio said that the revolver used in the robbery was probably at Majeno's house, and that additional firearms could be found in Jones's house.

During a subsequent search of Majeno's residence, the police found a loaded .357-caliber revolver, a box of .357-caliber ammunition, a black and white ski mask, and gang tagging. Two shotguns, a rifle, and ammunition were found in a bedroom at Jones's house. Methamphetamine and drug paraphernalia were found during a search of appellant's house. It was later determined that tire marks found on the gravel driveway leading to Vaca's house matched tires on the truck used in the robbery.

Detective Foote testified as the prosecution's gang expert. When presented with a hypothetical based on the evidence presented in the case, the detective opined that the crimes were committed for the benefit of, and in association with, the NSC gang.

DISCUSSION

*Section 654*

Appellant contends the court violated section 654's proscription against multiple punishment by failing to stay his sentence for false imprisonment. He claims that the false imprisonment and robbery were part of an indivisible course of conduct with a single intent and objective. We are not persuaded.

"'Section 654 prohibits multiple punishment for a single criminal act and for two crimes arising from a single indivisible course of conduct in which the defendant had only one criminal intent or objective. [Citation.] Thus: "If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once. [Citation.] If, however, a defendant had several

4

independent criminal objectives, he may be punished for each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct."  [Citation.]'  [Citation.]"  (*People v. Powell* (2011) 194 Cal.App.4th 1268, 1296.)

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination.  [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them.  [Citations.]"  (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)  We review the court's determination in the light most favorable to the judgment and presume the existence of every fact the court could reasonably deduce from the evidence.  (*Ibid.*)

In finding that section 654 did not bar separate punishment for the false imprisonment, the court referred to the evidence that Vaca was forced to crawl approximately 25 feet to the bathroom, get into the bathtub, and stay there.  Appellant contends that "the movement of Vaca to the bathroom was simply done in order for the perpetrators to effectuate their escape in completion of the robbery."  It is well settled, however, that "'[A] separate act of violence against an unresisting victim or witness, whether gratuitous or to facilitate escape or to avoid prosecution, may be found *not* incidental to robbery for purposes of section 654.'  [Citation.]"  (*People v. Sandoval* (1994) 30 Cal.App.4th 1288, 1300.)  Because the perpetrators were already in possession of the stolen items and there was nothing to prevent or hinder their escape, the subsequent act of forcing Vaca to crawl to the bathroom "was not necessary or incidental to committing the robbery."  (*People v. Foster* (1988) 201 Cal.App.3d 20, 27.)  Separate punishment for the false imprisonment was thus proper.  (*Ibid.*; see also *Sandoval*, at pp. 1299-1300 [defendant who shot victim who refused demand for money properly sentenced for both attempted robbery and attempted murder]; *In re Jesse F.* (1982) 137 Cal.App.3d 164, 171 [separate punishment not barred for attempted murder of victim who fled after robbers obtained loot "and their escape was apparently assured"].)

5

*Gang Enhancement (§ 186.22, subd. (b)(1)(B))*

Appellant claims the evidence is insufficient to support the gang enhancement imposed on the robbery count (§ 186.22, subd. (b)).  We disagree.

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.  [Citation.]"  (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).)

For the gang enhancement to apply, "the prosecution must prove that the crime for which the defendant was convicted had been 'committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.'  (§ 186.22, subd. (b)(1) . . . .)  In addition, the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting *two or more* of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period.  (§ 186.22, subds. (e) and (f).)"  (*People v. Gardeley* (1996) 14 Cal.4th 605, 616-617.)

Appellant contends the evidence is insufficient to support the gang enhancement because "[t]he 'predicate offenses' introduced by the prosecution . . . clearly occurred while the NSC[] was dormant and predated the recent revival of the NSC[] gang."[3]  This claim misconstrues the evidence.  Detective Foote testified that the gang

---

[3] For the first time in his reply brief, appellant asserts that the evidence is also insufficient to prove NSC was an "ongoing association" whose "primary activities"

6

had been "*predominantly* dormant as of the last 20 years, but in the last two years, they've been actively recruiting." (Italics added.) The "predicate offenses" to which the detective testified—which included a 1998 conviction for assault with a deadly weapon, a 2005 conviction for second degree burglary, a 2006 conviction for identity theft, and convictions for auto thefts that occurred in 2000, 2004, and 2006—demonstrate that the gang was at least partially active during the period in question. Moreover, at least one of the offenses occurred after the effective date of the statute, the last offense occurred within three years of a prior offense, and the offenses were committed on separate occasions by two or more persons. (§ 186.22, subd. (e).) The evidence was thus sufficient to prove that NSC's members had engaged in a "pattern of criminal gang activity" as provided in subdivision (e) of section 186.22.

Appellant claims the evidence is also insufficient to prove the robbery was committed for the benefit of, at the direction of, or in association with the NSC gang. Detective Foote's expert opinion, however, was sufficient to establish this finding. We are not persuaded otherwise by the line of cases appellant offers for the proposition that a gang expert's opinion must be supported by additional evidence demonstrating that the crime was committed to benefit a gang. (See *People v. Ochoa* (2009) 179 Cal.App.4th 650, 657; *People v. Ramon* (2009) 175 Cal.App.4th 843, 851; *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*); *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199.) The continuing validity of these cases has been called into doubt by our Supreme Court's more recent holding that "'[e]xpert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section

included crimes enumerated in subdivision (e) of section 186.22. Because this claim was not raised in the opening brief, it is forfeited. (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.) In any event, Detective Foote's expert testimony was sufficient to prove these elements of the enhancement. (*In re Jose P.* (2003) 106 Cal.App.4th 458, 467; *People v. Sengpadychith* (2001) 26 Cal.4th 316, 324.)

186.22, subdivision (b)(1), gang enhancement. [Citation.]" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048; see also *Albillar, supra*, 51 Cal.4th at p. 63 ["Expert opinion that particular criminal conduct benefited a gang . . . can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22(b)(1)"].)[4]

In any event, additional evidence supported Detective Foote's opinion that the robbery was committed for the benefit of, at the direction of, or in association with a criminal street gang. Appellant was an NSC associate and solicited known members of the gang to assist him in robbing Vaca. The participants' common allegiance to NSC "ensured that they could rely on each other's cooperation in committing these crimes and that they would benefit from committing them together." (*Albillar, supra*, 51 Cal.4th at pp. 61-62.) They also had reason to believe that "the gang's internal code [would] ensure that none of them would cooperate with the police" if they ever came under suspicion. (*Id.* at p. 62.) Although Zamudio ultimately betrayed this code, he participated in the robbery because he wanted to "put in work for [his] gang." Zamudio also admitted that he gained respect within the gang for committing the crime. In light of this evidence, the jury could reasonably infer that appellant and his coparticipants "came together" as members or associates of the gang to commit the crimes "and, thus, that they committed these crimes in association with the gang. [Citations.]" (*Ibid.*) Appellant notes "it is conceivable that several gang members could commit a crime together, yet be on a frolic

---

**4** *Albarran, supra*, 149 Cal.App.4th 214, which appellant discusses at length in his opening brief, is in any event inapposite. The case involved neither the sufficiency of the expert's opinion to prove a gang enhancement nor a substantial evidence issue; rather, the court held that the gang evidence was irrelevant to the underlying charges and that its admission rendered the defendant's trial fundamentally unfair. (*Id.* at p. 229.)

and detour unrelated to the gang" (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198), yet the record does not mandate such a finding here.[5]

The judgment is affirmed.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:


GILBERT, P. J.


YEGAN, J.

---

[5] In light of our conclusion, we need not address appellant's separate contention that the insufficiency of the evidence supporting the gang enhancements renders the imposition of the enhancements a violation of his state and federal due process rights.

Nancy Ayers, Judge

Superior Court County of Ventura

_____


William Paul Melcher, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, Daniel C. Chang, Deputy Attorney General, for Plaintiff and Respondent.