Filed 11/19/14  P. v. Bowles CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048542 |
| v. | (Super. Ct. No. 07NF1324) |
| JEREMY ROBERT BOWLES, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, William R. Froeberg, Judge.  Affirmed.

Tonja R. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Jeremy Robert Bowles was charged with committing a string of residential burglaries and shooting at, and attempting to kill, a police officer who tried to take him into custody. At trial, appellant conceded the burglary charges but insisted he was not the person who shot at the officer. To prove he was, the prosecution introduced evidence appellant attempted to murder a drug dealer three days before the officer shooting. Although appellant was not charged in connection with that prior incident, the prosecution argued it was relevant to show appellant's motive and intent to shoot the officer. Having been convicted on all counts, appellant argues the evidence regarding the incident with the drug dealer violated his right to a fair trial. He also contends reversal is required because his expert witness was not allowed to opine about the reliability of certain identification evidence, and the prosecutor misstated the law in closing argument. Finding appellant's arguments unavailing, we affirm the judgment against him.

FACTS

In February 2007, there was a spate of residential burglaries in and around Fullerton. Sometimes the perpetrator strong-armed the victims into surrendering their valuables, and other times he struck when they were not home. The investigation led to appellant, and following his arrest on February 25, 2007, the police found much of the stolen property in his motel room. When questioned, appellant admitted being a burglar and a drug addict. He said he robbed from the rich to give to the poor but ended up keeping many of the items he stole – such as a Lexus GS430 automobile – simply because he liked them. He was charged and remained in custody until posting bond in August 2008. When he failed to appear for his preliminary hearing on September 16, 2008, a warrant was issued for his arrest.

Appellant had spent the previous evening, September 15, with his friend Thomas Cho. They were owed money from a drug dealer named Mark Chavez, so they enlisted Lori Odle, one of Chavez's regular customers, to help them out. They had Odle tell Chavez she was interested in buying a large amount of methamphetamine from him.

2

That was enough to convince Chavez to come over to Odle's home on the night of September 15. When he showed up, Odle led him to her car, which was parked in her driveway, and they started smoking methamphetamine together. A short time later, Cho and appellant arrived in Cho's car, and Cho confronted Chavez. Standing next to Chavez's window, Cho asked him, "You don't know how to call me back or what?" Then Cho opened Chavez's door and tried to pull him out of the car. While that was happening, appellant appeared with a gun and shot Chavez. As Chavez's body lay motionless on the ground, Cho and appellant fled the scene, and Odle called the police. Although she identified appellant as the shooter, he was never charged with attempting to murder Chavez. Instead, the prosecution in the instant case argued the Chavez shooting was relevant to prove appellant's motive and intent with respect to an incident that occurred a few days later, on September 18, 2008.

That morning, appellant's photo was displayed on a wanted flier that was shown to members of the Buena Park Police Department, including Patrol Officer Pedro Montez. The flier stated appellant was wanted for failing to appear in court, but it did not include any information about the recent Chavez shooting. The flier also included the picture of a suspect named Marcel Barajas.

Having recently seen Barajas at the Walden Glenn Apartments, Montez drove there and set up surveillance in the parking lot. However, instead of finding Barajas, Montez spotted Cho driving a black Honda Accord with a front passenger who resembled appellant. After Cho noticed Montez, he said something to his passenger, who then looked over at Montez. At that point, Montez believed the man was in fact appellant, so he followed Cho's car out of the parking lot.

Cho's car accelerated quickly and began weaving in and out of traffic, but Montez was able to keep up with it. At one point, while Cho was stopped at a traffic light, Montez pulled behind him and turned on his overhead lights. However, when the traffic light turned green, Cho kept driving. Montez activated his siren and followed Cho

3

as he drove toward the I-5 freeway. When Cho reached the freeway on-ramp, he stopped his car, and Montez stopped behind it. Cho's passenger then opened his door and extended his arm toward Montez. Noticing the man was holding a dark object in his hand, Montez exited his vehicle and took cover behind his car door. Then he heard a gunshot and saw Cho's car take off down the on-ramp.

Montez radioed for backup and followed Cho. Just before Cho reached the freeway, his passenger stuck his arm and head out of his window and fired another shot at Montez. At that time, Montez noticed the man was wearing a white T-shirt and a black baseball hat. The chase continued onto the freeway, as Cho dodged traffic and reached speeds up to 100 m.p.h. At one point during the pursuit, Cho's passenger positioned himself so he was sitting on his window frame facing Montez and fired three more shots toward the officer. Montez engaged in evasive driving to avoid getting hit. He noticed the passenger's hat come flying off as Cho exited the freeway at the Valley View Avenue off-ramp.

The chase continued at high speed as Cho proceeded north on Valley View. He ran several red lights before eventually slowing down at Bora Drive, in a residential area of La Mirada. At that point, Cho's passenger exited the vehicle and fled on foot, still holding his gun. Cho continued on a short distance to Mansa Drive, where he stopped his car and tried to run away. However, Montez caught him and placed him under arrest. Montez waited with Cho as other officers arrived on the scene and a police perimeter was established around the area.

A short time later, Yojhan Pinzon was detained nearby because he fit the description of Cho's passenger and witnesses saw him running in the area. At the time he was taken into custody, Pinzon was shirtless, sweaty, and carrying a black T-shirt in his hands. The police transported him to the scene and asked Officer Montez if he was the shooter. At that point in time, Montez indicated Pinzon matched the description of the shooter. However, in his mind, Montez was not entirely positive Pinzon was the gunman.

4

Describing his feelings at trial, Montez said that while Pinzon "resembled" the shooter, he was not sure Pinzon was the guy because "there was just something about his facial appearance that did not seem the same." Nonetheless, Pinzon was arrested and taken into custody.

When Montez got back to the police station, his uncertainty about Pinzon persisted. So he went to the detective bureau and looked at some in-house photographs of appellant and compared them in his mind to the person who had fired at him during the chase. Through this process, Montez came to the realization appellant was the shooter, not Pinzon. Montez proceeded to inform his supervisors of this, so Pinzon – an "innocent man" – would not have to suffer.

Meanwhile, appellant was still on the loose. Shortly after the car chase ended, he entered a home near Valley View and Mansa, where 23-year-old Victor Ramirez lived with his parents. Ramirez was getting ready for school when he noticed appellant inside his house. Appellant motioned for Ramirez to keep quiet and asked if he could stay at his house. Hearing helicopters overhead and police activity outside, Ramirez figured appellant was a fugitive. Although he refused to let appellant hide in his house, he did help appellant out. After gaining appellant's assurance that he would never return to his house, Ramirez sneaked appellant past the police in the trunk of his car and dropped him off in Fullerton. Ramirez did not tell anyone about this incident until two years later, after his mother found a gun in their house. At that point, Ramirez told his parents about his encounter with appellant, and they turned the gun over to the police.

When police investigators searched the area of the I-5 where the shootings occurred, they found one live round of ammunition and a small bullet fragment. They also discovered the black baseball hat that had flown off the shooter's head during the pursuit. Forensic testing revealed appellant was a major contributor of DNA found on the hat. In addition, appellant's DNA matched DNA that was found in the passenger compartment of Cho's car. Pinzon, on the other hand, was effectively excluded as a

source of this DNA. Although gunshot residue was found on his hands after he was taken into arrest, there was testimony suggesting the residue could have come from the police officers who arrested him.

Testifying for the defense, identification expert Dr. Mitchell Eisen spoke about the factors that affect the reliability of eyewitness identification. He said that all witnesses, including police officers, are subject to making mistaken identifications, and the degree of confidence a person expresses in a particular identification is not necessarily indicative of its reliability. He warned that, over time, people tend to become more and more confident in their identifications, even if they are not correct.

In closing argument, defense counsel conceded appellant was a "thug and a thief" and plainly guilty of all 19 theft-related charges. However, defense counsel posited appellant was not guilty of attempting to murder Officer Montez for two reasons: 1) appellant was not the shooter (Pinzon was), and 2) even if he was, he was only trying evade the officer, not kill him. The jury was not persuaded. In addition to convicting appellant of the theft-related charges, it found him guilty of attempted premeditated murder, shooting from a vehicle, shooting at an occupied vehicle, assaulting a police officer with a firearm, recklessly evading the police and possessing a firearm as a felon. At sentencing, the trial court sentenced appellant to 53 years in prison, plus a life term with the possibility of parole.[1]

*Admissibility of the Prior Shooting*

Appellant contends the trial court abused its discretion and violated his right to a fair trial by allowing the prosecution to introduce evidence regarding the Chavez shooting. We disagree.

_____

[1]     Cho was tried separately and convicted of shooting from a vehicle, shooting at an occupied vehicle, assaulting a police officer with a firearm and recklessly evading the police. (*People v. Cho* (July 29, 2013, G047006) [nonpub. opn.].)

6

Under Evidence Code section 1101, evidence of a defendant's uncharged conduct is generally inadmissible to prove his behavior on a specific occasion or his propensity for criminal activity. (Evid. Code, § 1101, subd. (a).) However, such evidence may be admitted if it is relevant to some other issue that is material in the case, such as identity, plan, motive or intent. (*Id.*, subd. (b).) While evidence of uncharged conduct may be excluded under Evidence Code section 352 if its probative value is substantially outweighed by its prejudicial effect, the trial court has considerable discretion in making this determination. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404-405.) In fact, rulings made under Evidence Code sections 1101 and 352 will not be disturbed on appeal unless they are arbitrary, capricious or patently absurd. (*People v. Rogers* (2013) 57 Cal.4th 296, 326.)

In the present case, the evidence showing appellant shot Chavez was admitted for the limited purpose of showing his motive and intent in shooting at Officer Montez. The prosecution theorized the Chavez shooting gave appellant "all the motive in the world" not to surrender to Montez, which is why he fired so many shots at, and tried to kill, him. In accepting this theory, the trial court rejected appellant's claim the Chavez shooting was unduly prejudicial. The court ruled "on balance, it's probative and it's not inflammatory in comparison to what is alleged in this case."

Appellant contends the Chavez shooting was irrelevant to the issue of intent because it was "completely dissimilar" from the Montez shooting. However, during both incidents appellant used a firearm and was accompanied by Cho. The record shows Cho was the one who drove appellant to and away from the scene of the Chavez shooting, and he was also behind the wheel while appellant was shooting at Officer Montez. While the two shootings occurred under different circumstances, we must remember that to be admissible on the issue of intent, uncharged conduct need not be virtually identical to the charged offense. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 16-17.) While there must be some similarity between the two, the more important question is whether the

7

uncharged conduct sheds any light on why the defendant may have committed the charged offense. (*Ibid*.)

Here, the fact that appellant fired a shotgun at Chavez at close range less than 72 hours before the chase with Montez was logically relevant to his intent in shooting at Montez. According to eyewitness Odle, Chavez fell to the ground and was motionless after appellant shot him. Although Chavez ultimately survived the shooting, appellant could very well have thought that he had killed Chavez and that he was wanted for murder when Montez started chasing him and Cho. Such a belief would have provided appellant with a tremendous incentive not to let Montez catch him and take him in. It would certainly help explain why appellant took such extreme measures to avoid capture by repeatedly firing at Montez during the chase. (See *People v. Mendoza* (2011) 52 Cal.4th 1056, 1091-1092 [evidence the defendant was on parole and did not want to go back to jail at the time he shot and killed a police officer was properly admitted to show he committed premeditated murder in order to avoid being arrested and returned to custody].)

Appellant also argues the evidence of the Chavez shooting was cumulative on the issues of motive and intent because the jury knew he was a fugitive from justice at the time of the shooting. Given that he was already facing multiple burglary charges when the shooting occurred, appellant contends it was "completely unnecessary" to introduce evidence he shot Chavez. However, burglary is not the same as murder or attempted murder. It is not unreasonable to presume that a person who is wanted for shooting someone at close range would have a *greater* incentive and be *more* inclined to resort to deadly violence in order to avoid police capture than a person who is wanted solely for theft-related activity. Granted, the distinction is a matter of degree, but it was enough to justify evidence of the Chavez shooting in this case. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 669 [trial court did not abuse its discretion in admitting evidence concerning both appellant's prior convictions and his status as a parolee because, *taken*

8

*together*, they revealed the full extent to which appellant was motivated to shoot and kill a police officer in order to avoid being taken into custody].)

Appellant points out that, before trial, he was willing to stipulate to the existence of motive and intent. However, "'[A] criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it.' [Citation.]" (*People v. Rogers, supra,* 57 Cal.4th at p. 330.) While the case against appellant was quite strong – even without the Chavez shooting evidence – "the prosecution had the right to present all available evidence to meet its burden of proving the requisite mens rea for [attempted premeditated] murder beyond a reasonable doubt. [Citations.]" (*Ibid*.) That included the evidence of appellant's involvement in the Chavez shooting.

That brings us to the issue of prejudice. Appellant argues that because there was no evidence he was prosecuted for the Chavez shooting, the jury would have been inclined to punish him for that shooting, regardless of his guilt in the present case. He also fears the jury may have misused the evidence of the Chavez shooting for the purpose of proving the issue of identity. But throughout the trial, the judge, the prosecutor and defense counsel repeatedly told the jurors they could only consider the Chavez shooting for the limited purpose of ascertaining appellant's motive and intent. On at least a half a dozen occasions, the jurors were expressly told that they could not consider the Chavez shooting for any other purpose.

In light of these instructions, and given the fact the Chavez shooting was no more incendiary than the Montez shooting, we do not believe the challenged evidence was unduly prejudicial. (See *People v. Fuiava, supra*, 53 Cal.4th at p. 669 [emphasizing the importance of such instructions in limiting the potentially prejudicial effect of prior crimes evidence].) Therefore, the trial court did not abuse its discretion or violate appellant's right to a fair trial by admitting it. Because the evidence concerning the

9

Chavez shooting was more probative than prejudicial, we have no occasion to disturb the court's ruling.

*Limitations on Defense Expert's Testimony*

Appellant also contends the trial court erred in refusing to let his expert witness answer a hypothetical question about the accuracy of Officer Montez's initial identification of Pinzon. Again, we disagree.

After Dr. Eisen testified about the general factors affecting the reliability of eyewitness identification, defense counsel asked him a lengthy hypothetical question steeped in the facts of the case. Here is how the questioning unfolded:

"Q. [by defense counsel]: Assume that a witness to a crime came to a certain location to find a particular person or persons. Assume that this witness had seen head shots of these persons earlier that same day and was at this location to find them. Also assume that, while at the scene, this witness peered into a passing car, and based on what he saw when he looked into the passing car, he decided at that moment in time that the passenger was one of the guys he was looking for. [¶] Assume that this was a definitive, honest and sincere belief on his part. [¶] Now, add to this hypothetical that what followed was a car chase with this vehicle and that during this chase the passenger leaned out of the window, sat in the window of the car on the freeway with a gun and apparently started shooting towards the witness.

"A. [Dr. Eisen]: Yes.

"[¶] . . . [¶]

"Q. . . . Now, add to the hypothetical that right after the chase, while it was freshest in his mind, the witness was a shown a suspect in an in-field show-up, okay? He was caught by other police officers within the [perimeter].

"[¶] . . . [¶]

"Q. And, according to the officer's report who conducted the show-up, the witness immediately and without hesitation identified him as the passenger of the car

10

who was leaning out the window and shooting at him. [¶] Now, assume that, according to available reports, the witness believed that he had just identified the person whose heads shots he had seen earlier that day.

"A. Yes.

"Q. But it turned out that it was not the same guy and that the witness had, in fact, confused the person he identified with the guy whose picture he had seen earlier that day. Are you still with me?

"A. Yes.

"[¶] . . .

"Q. Now, finally assume that when the witness learned that the guy who he just identified was not the guy who he thought he was chasing, he qualified his identification and recorded that he had only stated, 'This guy resembled the guy I was chasing.'

"A. Yes.

"Q. All right? [¶] Based on the research and not specific to the I.D.'s of the witnesses in this case, what's the best indication of a person's memory, the report made right after the event while it was freshest in their mind or a report after some delay and after the witness had time to rethink his experience?"

At that point, the prosecutor objected, "improper hypothetical," and the court sustained the objection. The court reasoned that while Dr. Eisen could talk about the issue of memory in general terms, he could not "render an opinion as to which [identification] is more accurate," because "that's the jury's job at this point."

Appellant contends the trial court's refusal to let Dr. Eisen answer the hypothetical question infringed his constitutional right to present a defense. He sees no reason why Dr. Eisen should not have been allowed "to render an opinion regarding the likely accuracy of the eyewitness identification at issue – Officer Montez's."

11

However, while the trial court has the discretion to allow expert testimony on the issue of eyewitness identification (see *People v. McDonald* (1984) 37 Cal.3d 351, disapproved on another point in *People v. Mendoza* (2000) 23 Cal.4th 896, 914), there is a distinction between expert testimony regarding the factors which may lead to an inaccurate or unreliable identification and expert testimony concerning the particular identifications at issue in the case. As our high court has explained, expert identification testimony "does *not* seek to take over the jury's task of judging credibility: . . . it does not tell the jury that any particular witness is or is not truthful or accurate in his identification . . . . Rather, it informs the jury of certain factors that may affect such an identification in a typical case; and to the extent that it may refer to the particular circumstances of the identification before the jury, such testimony is limited to explaining the potential effects of those circumstances on the powers of observation and recollection of a typical eyewitness." (*Id*. at pp. 370-371.)

Here, the proposed hypothetical question went beyond that limitation by seeking to elicit expert testimony about the reliability of Montez's identifications in this case. It sought a conclusion about which identification was accurate in this case. The trial court's decision to preclude this testimony was therefore proper and correct. The court's ruling did not violate appellant's right to present a defense because Dr. Eisen was allowed to testify at length regarding the applicable factors affecting the reliability of eyewitness identification. Having heard Dr. Eisen's testimony in this regard, the jury was fully qualified to ascertain whether, and to what extent, those factors affected the reliability of the identification evidence presented in this case. (*People v. Brandon* (1995) 32 Cal.App.4th 1033, 1053; *People v. Sandoval* (1994) 30 Cal.App.4th 1288, 1298; *People v. Page* (1991) 2 Cal.App.4th 161, 188.)

*Alleged Prosecutorial Misconduct*

During closing argument, the prosecutor utilized an analogy about driving a car in attempting to explain the elements of premeditation and deliberation. Appellant

12

argues the analogy minimized the seriousness of the charges and diminished the prosecution's burden of proof on the attempted murder charge, but we do not see it that way.

In discussing the attempted murder charge, the prosecutor told the jury a person deliberates if he carefully weighs the considerations for and against his decision to kill, and he premeditates if he decides to kill before acting. The prosecutor further stated, "The length of time [a person] spends considering whether to kill does not alone determine whether the attempted killing is deliberated and premeditated. . . . [A] cold calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time." Those comments parroted the court's instructions on attempted murder and are not challenged on appeal. (See CALCRIM No. 601.)

However, appellant does challenge what the prosecutor said next. He told the jurors, "Let me give this example if I can? This probably . . . happened to some of us coming to work this morning or coming to jury duty this morning. You're driving down the street and you're coming upon an intersection[,] as you get close to the intersection you see that the light phases from green to yellow. And in your mind you start to make a determination[,] am I going to go or am I going to stop? And you deliberate and you premeditate. And you know that you can reach this conclusion pretty quickly. You know that there's a danger that if you go through[,] the light may phase to red and there may be an accident in the intersection or there's a red light camera or maybe there's a highway patrolmen, . . . and maybe you will get a ticket; but you make that decision and you're able to weigh those factors pretty quickly. [¶] Okay. That's kind of the law on premeditation and deliberation. You can weigh the factors."

Defense counsel did not object to these remarks, but in her closing argument she contended the intent required for premeditation and deliberation was not akin to the "split second decision" people face at a yellow light. Deriding the prosecutor's argument, she asserted, "What's the consequence of going through a red

13

light?  A ticket?  That's the deliberation [required] for [premeditated] intent to kill?  That's a horrible example.  This is not what the law requires."  Alluding to the court's jury instructions, defense counsel then proceeded to explain that attempted premeditated murder requires a careful weighing of the consequences and that "[a] decision to kill made rashly, impulsively or without careful consideration of the choice and its consequences" is not deliberate and premeditated.

The prosecutor returned to this point in his rebuttal argument.  He stated, "I know the defense doesn't like my examples, but . . . we premeditate and deliberate and think about the consequences [when deciding] whether [to] take our foot off the accelerator and put it on the brake or we just stay on the accelerator [and] go through a yellow light.  [¶] You're weighing the consequences of your actions.  It doesn't mean that you need to know what the fine is for running a red light.  It doesn't mean that you need to know whether you're going to get a ticket or you're going to strike another vehicle.  It doesn't mean that when we're talking about the premeditation and deliberation of an attempted murder that you know whether or not somebody definitely is going to get hit or die.  It doesn't mean you know what the actual charges that you're [going to be] facing or the consequences of those charges.  That's not what we're talking about.

"We're talking about cause and effect.  You pull the trigger in order to shoot somebody and you know what your actions are doing.  You have the intent to kill.  Nobody, nobody picks up a firearm, racks the slide to make sure that there's a chambered round, aims it at [a] police officer and pulls that trigger without the intent to kill.  And to do it four more times, four more times.  [¶] And if that's not intent to kill with premeditation and deliberation when the first shot is a minute and 40 seconds after you saw the officer for the first time I don't know what is."

There are several reasons why the prosecutor's comments do not amount to reversible error.  First, defense counsel never objected to them and instead chose to address them in her own closing argument.  Claims regarding alleged prosecutorial

14

misconduct are generally forfeited on appeal absent an objection in the trial court. (*People v. Morales* (2001) 25 Cal.4th 34, 43-44; *People v. Samayoa* (1997) 15 Cal.4th 795, 841.) You cannot parry an opponent's thrust and then complain it was illegal if you fail.

Second, in using the example of a driver facing a yellow light to explain the concepts of premeditation and deliberation, the prosecutor was simply trying to emphasize the point that those elements do not require an extended thought process. As the trial court's instructions made clear, and our Supreme Court has repeatedly stated, premeditation and deliberation can indeed occur in a very short period of time. (CALCRIM No. 601 ["a cold, calculated decision to kill can be reached quickly"]; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294 [premeditation and deliberation "can occur in a brief interval"].) Therefore, the prosecutor's remarks were not misleading. (See *People v. Osband* (1996) 13 Cal.4th 622, 697-698 [prosecutor did not misstate the law by arguing premeditation simply means considered beforehand].)

Third, the prosecutor's comments did not trivialize or misstate the state's burden of proof. In arguing otherwise, appellant relies on *People v. Johnson* (2004) 119 Cal.App.4th 976 and *People v. Nguyen* (1995) 40 Cal.App.4th 28, but those case are inapt because they involved prosecutorial comments on the reasonable doubt standard, not the elements of premeditation and deliberation. The truth is, there was nothing in the prosecutor's traffic light analogy that suggested she did not have to prove premeditation and deliberation beyond a reasonable doubt. That being the case, we fail to see how the analogy could possibly have led the jury to apply an incorrect standard of proof in assessing the truth of the attempted murder charge.

Lastly, appellant could not have been prejudiced by the prosecutor's remarks, because the jurors were 1) properly instructed on the prosecution's burden of proof and the definition of premeditation and deliberation, and 2) told they must follow the court's instructions if they conflict with anything said by the attorneys during

15

argument.  (See CALCRIM No. 200.)  Given these instructions, it is not reasonably likely the prosecutor's challenged remarks actually misled the jury.  Therefore, there is no cause for reversal.  (*People v. Morales, supra*, 25 Cal.4th at p. 47.)

DISPOSITION

The judgment is affirmed.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.

16