Filed 10/23/15  P. v. Shell CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B257034 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA084967) |
| v. | |
| BILLIE DUREYEA SHELL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Scott T. Millington, Judge.  Affirmed with directions.

Mark L. Christiansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, and Idan Ivri, Deputy Attorney General, for Plaintiff and Respondent.

_____

Billie Dureyea Shell appeals from the judgment entered following a jury trial in which he was convicted of one count of second degree murder in violation of Penal Code section 187.[1]  Appellant contends reversal is required, based on the prosecutor's misstatement of law on reasonable doubt and the trial court's refusal to instruct on the lesser included offense of manslaughter.  We disagree.  However, as the Attorney General concedes, one of the five one-year enhancements imposed pursuant to section 667.5, subdivision (b) must be struck.  We agree and remand to the trial court for modification of defendant's sentence.  In all other respects, the judgment is affirmed.

## PROCEDURAL BACKGROUND

Appellant was charged with one count of first degree murder in violation of section 187, subdivision (a).  The jury found appellant not guilty of the crime of first degree murder, but convicted him of the lesser included offense of second degree murder.  The jury further found true three special allegations that appellant personally used and discharged a firearm in the commission of the offense within the meaning of section 12022.53, subdivisions (b), (c), and (d).

Following a bifurcated trial on priors, the court found that appellant had suffered two strike priors pursuant to the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), two prior convictions pursuant to section 667, subdivision (a)(1), and had served five prior prison terms within the meaning of section 667.5, subdivision (b).  Appellant was sentenced to an aggregate term of 85 years to life in state prison.

## FACTUAL BACKGROUND

### The Prosecution Case

On July 18, 2012, just before 3:14 in the afternoon, Lynette Ammons was shot 17 times in the office of the business she operated with her husband, appellant Shell.  At least two of the shots were determined to have been fatal.  She was pronounced dead at the scene at 3:28  p.m.  Two employees and the 14-year-old granddaughter of the victim

---

[1] Undesignated statutory references are to the Penal Code.

2

were on the premises during the incident and positively identified appellant as the shooter.

Ammons[2] and appellant were married on June 2, 2012. In July 2012 they were operating two businesses together, a sober living home and a cleaning service known as Keep It Clean, located at 1123 North La Brea Avenue in Inglewood. In 2012 appellant was also ostensibly married to a woman named Donna Nelson or Donna Shell, whom he had married in 2009.[3] In May or June 2012, appellant met Nyah White. White was the assistant manager at the bank where the accounts for Keep It Clean and the sober living home were maintained. Appellant and White started having a sexual relationship in June 2012.

In June, Ammons's granddaughter, Denise G., started living with Ammons and appellant at their apartment, and saw appellant every day. Appellant and Ammons argued frequently. One morning in July, Ammons tried to jump off the apartment balcony during an argument with appellant, but Denise and appellant pulled her to safety before she fell. On another occasion in July 2012, Ammons threatened to burn appellant's clothes, shoot the tires on his car, and kill herself.

On July 18, 2012, Denise and Ammons went to the Keep It Clean offices. Denise was in an interior office with two employees, sisters Martha and Angelina Lopez. Another employee, Sylbert Pitts, was in his car parked behind the business.

From inside the office, Denise, Martha, and Angelina heard appellant and Ammons arguing loudly outside near the rear exit door of the building. All three recognized appellant's voice, but they could not make out exactly what was being said.

---

[2] References to individuals are by surname, unless other individuals involved in the case share the same surname.

[3] According to appellant, he and Donna had filed paperwork, but never "went all the way through with" getting married. On November 11, 2009, appellant choked Donna during an argument at her home. When police arrived, appellant refused to let them in and escaped through the window.

Appellant and Ammons moved inside toward the front of the business, as they continued their heated exchange.

Angelina saw appellant hit Ammons in the face, causing her to fall onto a desk, and Denise saw appellant push Ammons onto her back on a desk. As appellant leaned over Ammons, all three women saw appellant point a handgun at Ammons. Denise recognized the gun as one that appellant kept on his nightstand next to his bed. Ammons said, "If you are going to kill me, then kill me." Appellant responded, "B, I will kill you."

Appellant started to walk away, and Ammons stood up and followed him. Denise peeked around the wall and saw appellant shoot Ammons. Martha and Angelina pulled Denise back into the office and closed the door.

After Ammons and appellant went to the rear of the building, Martha and Angelina lost sight of them, but they heard gunshots from the hallway in the direction Ammons and appellant had gone.

Denise, Martha, and Angelina remained in the office until the shooting stopped. When Denise heard the music from appellant's car parked behind the business, she came out of the office. Denise rushed to her grandmother and saw blood coming from her back. Denise then saw appellant's black Jaguar driving down La Brea Avenue, passing in front of Keep It Clean. Martha called the police.

Two 911 calls were received on July 18, 2012. The first was a hang-up at 3:14 p.m. from a business landline at 1123 North La Brea. The second call in which the caller reported the shooting at Keep It Clean came from a cell phone at 3:17 p.m. When Inglewood police arrived at Keep It Clean approximately 3:15 p.m., Denise, Martha, and Angelina unequivocally identified appellant as the shooter.

Ammons was found on her back in a pool of blood with multiple nine-millimeter cartridge casings and bullet fragments on the ground near her body. The Los Angeles County coroner investigator at the scene noted multiple gunshot wounds to Ammons's chest, back, and arms. One bullet projectile was lodged just underneath Ammons's skin on her back, which suggested that Ammons had been shot in the chest while lying down

4

on her back.  Bullet holes in the wall were less than two and one-half feet high, indicating that the shooter had fired in a downward direction.

The cause of Ammons's death was determined to be multiple gunshot wounds. The forensic pathologist who examined Ammons's body identified 17 separate gunshot wounds, at least two of which were independently fatal.  Seven of the wounds were abdominal bullet wounds, which as a group were also fatal.

Between 3:00 and 4:00 p.m. on July 18, 2012, appellant called White at work. Appellant was crying and told White he had shot "Lynnette."  White thought he was joking and hung up.  Appellant called back and again told her he had shot his wife.

In the meantime, police had begun looking for appellant, and approximately 4:30 p.m., located appellant's Jaguar at the apartment appellant had shared with Ammons.  A search of the vehicle turned up an expended nine-millimeter cartridge casing in the driver's side door compartment.

Appellant arrived at White's home sometime around 8:00 p.m. on July 18, 2012. He seemed upset and shaken.  White noticed he was driving a Toyota Avalon, which she had not seen him drive before.  Appellant told her his Jaguar "had been impounded or that he had left it at the scene."

Appellant told White that he had been at Keep It Clean that day when Ammons came in screaming and had threatened to kill him.  Appellant said that Ammons had pulled a gun and "took a shot at him," but he wrestled the gun away, turned it toward her, and shot her.  Appellant showed White the gun he had used to shoot Ammons.  He tried to put the gun in White's hand to demonstrate how the shooting had happened, but White refused to touch the gun.

Appellant and White spent the night at the Crystal Inn in Inglewood.  The next day, White called the police from work.  She told them she had information about the Keep It Clean shooting and had just been with the shooter.  She asked that a plain clothes officer meet her at the bank in case appellant was watching.  When the plain clothes officer arrived, White gave him appellant's phone number.

5

White continued to take appellant's calls that day to enable police to track his location. Using cellular phone data, police located the Avalon and arrested appellant in Long Beach.

As appellant was ordered out of the car, police noticed a Smith & Wesson semiautomatic pistol between the driver's seat and the center console of the Avalon. The gun had a high-capacity 15-round magazine, which was loaded with nine-millimeter hollow point cartridges. Bullets and expended cartridge casings found at the crime scene as well as three bullets recovered from Ammons's body were subsequently determined to have been fired from the Smith & Wesson. Five expended nine-millimeter cartridge casings found in the passenger side door of the Avalon were also determined to have been fired from the Smith & Wesson.

### The Defense Case

The defense presented evidence that appellant was at the Department of Motor Vehicles (DMV) at 3700 West El Segundo Boulevard in Hawthorne at 2:53 p.m. on July 18, 2012. Appellant testified that prior to going to the DMV that day, he had gone to Keep It Clean in the morning, but did not see Ammons then.

Appellant returned to Keep It Clean approximately 1:00 p.m.[4] Appellant was outside in back when Ammons and Denise pulled up. Denise went inside as appellant and Ammons began to argue. Ammons followed appellant into the building and tried to take his phone from him. Ammons pushed appellant, and he pushed her back. As appellant started to walk away, Ammons picked up a cordless phone and threw it at him. Appellant then walked out the door, got in his car, and drove away. He did not pull a gun or shoot Ammons, nor did he return to Keep It Clean that day.

Appellant went directly from the Keep It Clean offices to "Brittany's house," and then to the DMV. Appellant's photo was taken at the DMV at 2:53 p.m. as part of a photo receipt an applicant receives at the time he takes a written driver's test. Appellant

---

[4] However, after his recollection was refreshed with his cell phone records, appellant stated that he got to the DMV "around 12, 12:07."

took and failed three driver's tests that day. He started a fourth test but did not complete it because he received a phone call from Athena White, his children's mother, asking him to come to her house. None of the driver's tests bore a time stamp.

Appellant left the DMV at 3:01 or 3:02 p.m. in his Jaguar and drove to his apartment where he picked up some belongings and switched vehicles. Appellant arrived at Athena's in the Avalon approximately 3:25 or 3:30 p.m. and stayed until approximately 7:45 or 8:00 p.m. Appellant then went to White's house. That evening White gave appellant a new cell phone as a gift. She suggested they spend the night at a motel to get away from her children, and they got a room at the Crystal Inn.

Appellant first learned of Ammons's death when he was arrested on the evening of July 19, 2012. The Avalon appellant was driving belonged to Ammons, and she usually kept a gun in the car. The nine-millimeter gun police found between the driver's seat and the center console of the Avalon was similar to a gun he believed belonged to Ammons, but appellant had not known it was in the car. No blood was detected in tests of various items of clothing belonging to appellant which were found in the Avalon at the time of appellant's arrest.

Appellant denied calling White at work the day of the shooting, he denied telling White he had shot Ammons, and he denied demonstrating the shooting or trying to get White to hold the gun.

## DISCUSSION

### I. To the Extent the Prosecutor Misstated the Law Regarding the Jury's Duties in Considering Possibilities Raised by the Evidence, the Error Was Harmless

Appellant contends the prosecutor misstated the law regarding reasonable doubt during voir dire and in closing argument to the jury, and the trial court compounded the error by refusing specifically to admonish the jury that it was to consider all reasonable interpretations of the evidence and reject those that were unreasonable. According to appellant, the prosecutor's misstatement of the law shifted the burden of proof, and, together with the trial court's error in refusing to give a curative instruction, requires reversal. We disagree.

7

**A.** *Relevant Background*

During voir dire questioning of prospective jurors, the prosecutor read to the jury a portion of the instruction defining reasonable doubt, emphasizing that the burden on the People was not proof beyond "all possible doubt." The prosecutor then posed a hypothetical to illustrate the distinction between direct and circumstantial evidence in the context of reasonable doubt:

Prosecutor: "Let's say your husband says, 'You know, we really need milk. I [will] go to the store and I will get some milk, okay?' You see him walk out of the house. You see him go into the garage, you can't see him any more after that, but you do hear the car start up, okay? And then you hear the garage door open and close. Fifteen minutes pass, he comes back into the house, you hear the garage door open, you hear the garage door close, and he comes back into the house and he has a carton of milk. What are the chances he went to the store and got a carton of milk?"

The prosecutor explained that "you can engage in the possibilities" that the husband got the milk from a neighbor or stole it, "[b]ut every day in our everyday lives even with things that are important, . . . [w]e look at circumstantial evidence to understand and believe that something happened." The prosecutor then asked the prospective jurors if, based on the hypothetical, they agreed it was proven beyond a reasonable doubt that the husband had gone to the store and purchased the milk. One prospective juror said no, because of the possibility that the husband could have gotten the milk from somewhere else. But when the prosecutor pressed, the juror admitted there was no evidence of that alternate scenario, and agreed with the prosecutor that considering such a possibility amounted to holding the prosecutor to a higher standard than beyond a reasonable doubt.

Outside the presence of the prospective jury panel defense counsel objected to the milk carton hypothetical and the prosecutor's suggestion that the jury's consideration of alternative interpretations of the evidence would constitute speculation which would result in holding the prosecution to a higher standard than beyond a reasonable doubt. The court agreed that the prosecutor's remarks misstated the law, declaring that

8

consideration of scenarios within the realm of possibility is not speculation. The judge said that if the prosecutor did not correct the error, the court would.

When voir dire resumed the next day, the prosecutor read CALCRIM No. 224 on the sufficiency of circumstantial evidence to support a finding of guilt.[5] The prosecutor then revisited the milk carton hypothetical from the day before, adding the facts that the husband returned with the milk and a dated receipt from the store, and had never been known to take milk from anyone. The prosecutor concluded by emphasizing the portion of the reasonable doubt instruction referring to possible doubt: "The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt," and added, "maybe Martians landed on the driveway . . . and gave [your husband] that milk. Is that reasonable? No."

In the opening instructions to the jury and again at the conclusion of the evidence, the trial court delivered the standard CALCRIM No. 220 instruction defining proof beyond a reasonable doubt. The court also instructed the jury that nothing that the attorneys say is evidence, and if the attorneys' comments on the law conflict with any of the court's instructions, the jury must follow the instructions. Finally, in its concluding instructions the court read CALCRIM No. 224 regarding the sufficiency of circumstantial evidence to prove guilt.

During closing argument, defense counsel pointed out that another employee of Keep It Clean had been seen in the parking lot while appellant and Ammons were arguing.[6] In rebuttal, the prosecutor argued that there was "absolutely no evidence" to

---

[5] "[B]efore you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusion[s] also points to innocence and another to guilt, you must accept the one that points to innocence. . . . However when considering circumstantial evidence you must accept only reasonable conclusions and reject any that are unreasonable."

[6] Prior to trial the court had excluded evidence of third party culpability on the ground that there was no evidence to support such a theory. Appellant has not challenged that ruling.

support an alternate defense theory that this person could have been the shooter. The prosecutor reiterated that the jury may consider only reasonable possibilities, not alternate theories that are "wholly unreasonable and completely and utterly without foundation or evidence." The prosecutor then invited the jury to "look thoroughly at all the evidence, . . . talk about it thoroughly, consider all the evidence, and look at what's reasonable. What does the evidence show? Not what you can speculate about, what's possible, because that is not what you are instructed to do." Defense counsel objected that the prosecutor was misstating the law, but the court simply told the prosecutor to "move on."

At a sidebar conference immediately following the arguments, defense counsel asserted that the prosecutor had repeated the mistake she had made during voir dire with the milk carton hypothetical. The defense requested "a curative instruction" that the jury consider what is "possible," and disregard only possibilities that are "unreasonable." Alternatively, the defense asked the court to reread the circumstantial evidence instruction. The court agreed to reread the reasonable doubt instruction, but denied the other defense requests, and began its final instructions to the jury by repeating CALCRIM No. 220.[7]

**B.** *Any Mischaracterization of the Law Regarding the People's Burden of Proof Was Harmless*

"'[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 829–830.) A prosecutor's misconduct[8] based on misstatements of

---

[7] Appellant states that a portion of CALCRIM No. 220 was emphasized with underlining: "The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." There is no indication that the copy of the jury instructions in the record on appeal is the same as the copy of the instructions in the jury room, nor is it possible to determine who underlined or made other marks on the jury instructions in the clerk's transcript.

[8] Appellant takes issue with respondent's reliance on cases relating to prosecutorial misconduct, claiming that such law is irrelevant to appellant's argument

10

the law amounts to federal constitutional error only "'"'"when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'"' [Citations.]'" (*Id*. at p. 819; *People v. Morales* (2001) 25 Cal.4th 34, 44.) Further, "Denial of the right to a jury verdict of guilt beyond a reasonable doubt" constitutes a "'structural defect[] in the constitution of the trial mechanism,'" which defies harmless error analysis. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 281–282 [113 S.Ct. 2078].) Prosecutorial misrepresentations, however, "are not to be judged as having the same force as an instruction from the court," and do not qualify as structural error. (*Boyde v. California* (1990) 494 U.S. 370, 384–385 [110 S.Ct. 1190].)

In the absence of structural error, a prosecutor's misstatement of the law is subject to a harmless error analysis, reversible only if there was a reasonable probability of a more favorable result for the defendant in the absence of the error. (*People v. Barnett*, *supra*, 17 Cal.4th at p. 1133 [applying the state standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836–837].) Where, as here, the claim of misconduct is based on the prosecutor's comments to the jury, "'"'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."' [Citations.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305; *People v. Morales*, *supra*, 25 Cal.4th at p. 44; *People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353.)

Here, after improperly suggesting during voir dire that "possibilities" raised by the evidence constitute "speculation," which cannot be considered, the prosecutor read CALCRIM No. 224, regarding the sufficiency of circumstantial evidence to support a finding of guilt. The prosecutor also amended the hypothetical and emphasized that

---

that the prosecutor made a mistake in misstating the law, but did not commit misconduct. However, because it is based on the prosecutor's comments before the jury, appellant's claim is indeed one of prosecutorial misconduct, which requires no showing of bad faith insofar as it is evaluated in accordance with an objective standard. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1133.)

11

jurors must reject those possibilities that are "unreasonable." The trial court then delivered the standard CALCRIM No. 220 instruction defining proof beyond a reasonable doubt, and instructed the jury that nothing that the attorneys say is evidence, and if the attorneys' comments on the law conflict with any of the court's instructions, the jury must follow the instructions.

We find these instructions and clarifications corrected any misstatements during voir dire regarding the jury's duty to consider possibilities raised by the evidence which could have misled prospective jurors.[9]

As for the prosecutor's statement during closing argument, we find no misstatement of law, and in any event, there appears no reasonable likelihood that the jury would have understood the prosecutor's argument to cause the mischief of which appellant complains. (See *People v. Osband* (1996) 13 Cal.4th 622, 696.) A prosecutor may forcefully argue the case, and "'"""'is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations] . . ." [Citation.]"'"" (*People v. Gamache* (2010) 48 Cal.4th 347, 371.) Further, the prosecution is accorded considerable freedom to describe deficiencies in the defense case and factual account. (*People v. Redd* (2010) 48 Cal.4th 691, 735.) Here, the People's argument came in response to the defense suggestion in closing that another employee of Keep It Clean might have had a role in the shooting. The prosecutor properly commented on the absence of any evidence to support such a proposition, and correctly argued that assigning third party culpability in this case would be entirely speculative. (See *People v. Marshall* (1996) 13 Cal.4th 799, 831–832 [prosecution may legitimately attack defense failure to present evidence in support of third party culpability theory].)

Even were we to assume misconduct based on the argument, we find any error in the court's refusal to admonish the jury as requested by appellant to be harmless. Before

---

[9] We further note this is the very remedy requested by the defense when objecting to closing argument on the ground that the prosecutor was misstating the law as she had during voir dire.

argument, the court had already emphasized the proof beyond a reasonable doubt standard and instructed the jury on the sufficiency of circumstantial evidence to support a finding of guilt. Then, in response to appellant's objection to the prosecution's rebuttal argument the court re-instructed the jury on reasonable doubt. Further, the court instructed the jury that to the extent "the attorneys' comments on the law conflict with [the court's] instructions," the jury was to follow the law as given by the court.

Where the jury is properly instructed on the law, we presume the jury followed the instructions given. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.) Indeed, "'Jurors are presumed to be intelligent, capable of understanding instructions and applying them to the facts of the case.' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 390.) Here, there is no evidence the jury was misled by the prosecutor's comments. By acquitting appellant of the most serious charge he faced, first degree murder, the jury demonstrated that it understood the applicable burden of proof, and applied it to appellant's advantage.

## II.     The Trial Court Properly Refused the Requested Manslaughter Instructions

The trial court refused the defense request for CALCRIM No. 511 (excusable homicide: accident in the heat of passion), CALCRIM No. 522 (provocation: effect on degree of murder), CALCRIM No. 570 (voluntary manslaughter: heat of passion—lesser included offense), and CALCRIM No. 580 (involuntary manslaughter: lesser included offense). Appellant contends that "[t]he common thread in these requests is action from the heat of passion," and goes on to summarize the law regarding heat of passion as it relates to voluntary manslaughter.[10]

---

[10] Appellant does not specify the evidentiary support for each of the four requested instructions, simply arguing that substantial evidence of provocation would have supported a "manslaughter verdict" had the jury been properly instructed. Respondent addresses only the trial court's refusal to instruct on voluntary manslaughter (CALCRIM No. 570), arguing that the evidence was insufficient to support the instruction, and any error in its omission was harmless. We have examined the other instructions requested by appellant and are satisfied that these instructions were properly omitted insofar as they are unsupported by the evidence. As explained in *People v. Rodriguez* (1997) 53 Cal.App.4th 1250: "At a minimum, defendant must be able to explain how his theory . . . could have been argued to the jury, given the evidence. In spite of all this, defendant

13

We find no substantial evidence of provocation to justify a voluntary manslaughter instruction under a heat of passion theory. Accordingly, the trial court properly refused to give the requested instruction on this lesser included offense.

As the California Supreme Court has explained: "'an intentional killing is reduced to voluntary manslaughter if other evidence negates malice. Malice is presumptively absent when the defendant acts upon a sudden quarrel or heat of passion on sufficient provocation (§ 192, subd. (a)) . . . .'" (*People v. Manriquez* (2005) 37 Cal.4th 547, 583 (*Manriquez*).) Quoting *People v. Lee* (1999) 20 Cal.4th 47, 58–59, the high court continued: "'the factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.]'" (*Manriquez, supra*, 37 Cal.4th at pp. 583–584; *People v. Moye* (2009) 47 Cal.4th 537, 549.)

Thus, "[t]he heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1252; *Manriquez, supra*, 37 Cal.4th at p. 584.)

"'"To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.'" [Citation.]'" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144.)" (*People v. Moye, supra,* 47 Cal.4th at p. 549.) "'The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]'" (*Id*. at p. 550.) "'As [the high court] explained long ago in interpreting the same language of section 192, "this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person

wants to impose upon the trial court an obligation ""to glean legal theories and winnow the evidence for remotely tenable and sophistical instructions."'" [Citation.] We decline to do so." (*Id.* at p. 1276.)

14

under the given facts and circumstances," because "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man." (*People v. Logan* (1917) 175 Cal. 45, 49.)' [Citations.]" (*Manriquez*, *supra*, 37 Cal.4th at p. 584.)

"To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation. [Citation.]" (*People v. Moye*, *supra*, 47 Cal.4th at p. 550.) ""However, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter . . . ." [Citation.]' [Citation.]" (*Ibid.*)

"'[I]t is the "court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged and shown by the evidence to have been committed." [Citation.]' [Citations.] 'Conversely, even on request, the court "has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction[.]" [Citation.]' [Citation.] Substantial evidence 'is not merely "any evidence . . . no matter how weak" [citation], but rather "'evidence from which a jury composed of reasonable [persons] could . . . conclude[]'" that the lesser offense, but not the greater, was committed. [Citations.]' [Citation.]" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1327–1328.)

In the present case, we find the evidence of provocation insufficient to satisfy either the objective or subjective standard for voluntary manslaughter based on heat of passion. First, as respondent observes, appellant's defense was that "he didn't do it," and that the witnesses who saw him at Keep It Clean arguing with Ammons just before she was shot were mistaken in identifying appellant as the shooter. He thus presented extensive alibi testimony that he was at the DMV when Ammons was shot, he went straight from the DMV to his apartment, and then went to his children's mother's home without stopping at Keep It Clean. According to appellant, the heated argument with Ammons during which they pushed each other and she threw a phone at him took place

15

before appellant went to the DMV, hours before Ammons was killed. The prosecution case, on the other hand, was that appellant willfully murdered Ammons in cold blood. Thus, neither party presented any evidence that appellant killed Ammons in the heat of passion.

We therefore agree with respondent that, for this reason alone, the trial court did not err in refusing appellant's requested instruction on voluntary manslaughter based on heat of passion. (*People v. Gutierrez*, *supra*, 45 Cal.4th at p. 826 [no instruction on voluntary manslaughter warranted where defendant flatly denied killing the victim]; *People v. Barton* (1995) 12 Cal.4th 186, 196, fn. 5 [instruction on lesser included offense unjustified when evidence shows defendant is either guilty of the crime charged or not guilty of any offense].)

We further find no support for an instruction on involuntary manslaughter based on the evidence cited by appellant. Appellant points to evidence of "an on-going emotionally laden situation" between Ammons and appellant in the weeks leading up to Ammons's death, which included frequent emotionally charged arguments, threats, and Ammons's attempted suicide, which appellant prevented.

Appellant also cites White's testimony that appellant told her Ammons had pulled a gun and threatened to kill appellant during the confrontation on July 18 at Keep It Clean. After she "took a shot at him," he wrestled the gun from her, and shot her. But appellant himself refuted White's testimony and flatly denied making any such statements to White, claiming he was not at Keep It Clean when Ammons was killed. Moreover, White's recitation of this version of the shooting as related to her by appellant is directly contradicted by Denise's testimony, who was an eyewitness to the shooting. It is also at odds with the observations of the two other witnesses at Keep It Clean when Ammons was killed.

Appellant further maintains that Ammons's act of following appellant as he "retreat[ed]" down the hallway was "designed to provoke him," and "[w]hether this was from anger or because of Ammons['s] apparently suicidal inclinations makes no difference so long as the person engages in provocative conduct." We disagree that this

16

evidence was sufficient to establish provocation to justify a voluntary manslaughter instruction.

Even if Ammons's conduct here could be said to satisfy the *subjective* element for voluntary manslaughter based on heat of passion (see, e.g., *People v. Steele*, *supra*, 27 Cal.4th at p. 1253), courts have repeatedly held that heated arguments, insults, verbal threats, and taunts to use a weapon do not satisfy the *objective*, reasonable person requirement for heat of passion, which requires sufficient provocation by the victim. (*People v. Gutierrez*, *supra*, 45 Cal.4th at pp. 826–827 [victim cursing at defendant during an argument held insufficient]; *Manriquez*, *supra*, 37 Cal.4th at p. 586 [victim calling defendant a "mother fucker" and taunting him that if he had a weapon, "he should take it out and use it" held to be insufficient provocation]; *People v. Cole* (2004) 33 Cal.4th 1158, 1216 [fact that defendant and victim had a tumultuous relationship which included frequent arguing, yelling and cursing, and had a heated exchange earlier the same day were insufficient]; *People v. Najera* (2006) 138 Cal.App.4th 212, 226 [victim called defendant a "faggot" before the shooting].) Similarly, the high court has declared that simple assault, including scratching and kicking by the victim, "does not rise to the level of provocation necessary to support a voluntary manslaughter instruction." (*People v. Gutierrez*, *supra*, 45 Cal.4th at p. 827.)

Citing *Manriquez*, appellant contends that the jury's conviction of second degree rather than first degree murder reflects a finding that "''''the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.''' [Citation.]''' (*Manriquez*, *supra*, 37 Cal.4th at p. 584.) We disagree.

Appellant's argument might have merit if the trial court had instructed the jury pursuant to CALCRIM No. 522 (Provocation: effect on degree of murder), as requested by the defense. (See *People v. Thomas* (1945) 25 Cal.2d 880, 903.) But the trial court refused to give this instruction at the same time and for the same reasons that it rejected the voluntary manslaughter instruction: namely, there was no evidence of provocation.

17

Nevertheless, the jury could convict appellant of second degree rather than first degree murder without a finding of provocation by determining that appellant lacked the intent to kill (implied malice second degree murder), or he had the intent to kill but made the decision "rashly, impulsively, or without careful consideration," rather than with deliberation and premeditation.  (CALCRIM Nos. 520, 521.)

In sum, there was no substantial evidence of provocation to support a voluntary manslaughter instruction, and the trial court properly denied appellant's request for such instruction.  (See *People v. Avila* (2009) 46 Cal.4th 680, 707 [no error in refusing to instruct on voluntary manslaughter in the absence of evidence of provocation while instructing on second degree murder].)

## III.   The Section 667.5, Subdivision (b) Enhancements

In sentencing appellant to a total term of 85 years to life, the trial court imposed an additional five years for five state prison priors pursuant to section 667.5, subdivision (b).[11]  Appellant argues that three of the five section 667.5, subdivision (b) enhancements should be struck.  Respondent contends that only one of these enhancements need be struck.

The trial court imposed two five-year serious prior felony enhancements pursuant to section 667, subdivision (a)(1) for case Nos. 1 and 2.  These cases consisted of a single count each, and thus neither case could be used as the basis for a section 667.5, subdivision (b) enhancement.  (*People v. Jones* (1993) 5 Cal.4th 1142, 1152.)  This left

---

[11] We refer to the cases supporting the section 667.5, subdivision (b) enhancements by the numbering scheme used by appellant in the opening brief:
Case No. 1:  VA026679 (§ 211).
Case No. 2:  TA054004 (§ 422).
Case No. 3:  TA080083 (Veh. Code, § 10851).
Case No. 4:  NA071741 (Veh. Code, § 10851), consolidated with case No. 6.
Case No. 5:  TA033047 (§ 261.5).
Case No. 6:  YA069434 (§ 487, subd. (d)).
Case No. 7:  YA076801 (§ 273.5).
Case No. 8:  VA113187 (§ 476a).

18

six cases—case Nos. 3 through 8—remaining for possible imposition of the one-year enhancement under section 667.5, subdivision (b).

As both appellant and respondent observe, a section 667.5, subdivision (b) enhancement may be imposed only for terms that were entirely separate. (§ 667.5, subd. (g); *People v. Perez* (1992) 4 Cal.App.4th 893, 910–911; *People v. Burke* (1980) 102 Cal.App.3d 932, 943.) The trial court correctly recognized that the sentences in case Nos. 4 and 6 were served over the same period of time. Accordingly, these two cases could account for only a single one-year section 667.5, subdivision (b) enhancement. Similarly, the trial court correctly recognized that the sentences in case Nos. 7 and 8 were served together, and these cases could also form the basis for only a single one-year section 667.5, subdivision (b) enhancement as well.

Based on these findings, there remained only four cases for the section 667.5, subdivision (b) enhancements: No. TA080083 (case No. 3); either No. NA071741 (case No. 4) or No. YA069434 (case No. 6); No. TA033047 (case No. 5); and either No. YA076801 (case No. 7) or No. VA113187 (case No. 8). However, the trial court erroneously concluded that there were five section 667.5, subdivision (b) enhancements rather than four, and imposed an additional five years pursuant to section 667.5, subdivision (b). Accordingly, one of the one-year enhancements imposed under section 667.5, subdivision (b) must be struck.

Appellant, however, concludes that after correction of the trial court's error, only case Nos. 3, 5, and 7 remain for the section 667.5, subdivision (b) enhancement, and no enhancement should apply to case No. 4 or case No. 6.[12] In this regard, appellant contends that the expert's testimony concerning the dates of incarceration was not supported by the chronological history of appellant's movements in and out of prison

---

[12] In the opening brief, appellant fails to explain why no section 667.5, subdivision (b) enhancement should apply as to case No. 4 *or* case No. 6 and addresses this contention only in the reply brief.

19

custody.[13]  Specifically, appellant argues that the sentence in case No. 2 overlapped with the sentences in case Nos. 4 and 6, claiming that "case #2 did not discharge before #4 and #5 [*sic*] started (albeit they were not physically served in prison due to the accumulated jail time)."

Appellant's contention finds no support in the record.  Appellant was received in prison custody in case No. 2 on January 28, 2000, and released on August 13, 2003.  But appellant did not even commit the offense for which he was convicted in case No. 4 until 2006, well after his release from prison custody in case No. 2.[14]

Appellant further claims error in the imposition of the one-year enhancement based on case No. 5 because the sentence for that case was served concurrently with the sentence for case No. 1.  Respondent argues that "'a concurrent prison sentence imposed for two separate crimes, *one* of which was a serious felony prior . . . does not preclude imposition of the . . . one-year enhancement for the . . . [section 667.5, subdivision (b)] prior prison term allegation.'"  (*People v. Sandoval* (1994) 30 Cal.App.4th 1288, 1304, original italics, quoting *People v. Gonzales* (1993) 20 Cal.App.4th 1607, 1610; see also *People v. Medina* (1988) 206 Cal.App.3d 986, 989.)  Relying on *People v. James* (1985) 170 Cal.App.3d 164, 167 (*James*), appellant acknowledges a split in decisions on this issue, but maintains that permitting imposition of both a five-year and a one-year enhancement for concurrent sentences on a prior serious offense and a prior nonserious offense renders "the continuous term limitation concept of subdivision (g) of section 667.5 . . . artificial and meaningless."  We disagree.

---

[13] Appellant observes that the date given by the expert for the start of appellant's term of custody for case Nos. 4 and 6—May 4, 2009—was in fact the date of a parole violation, and that, according to an earlier entry in the chronological summary, the 16-month commitment in those cases was deemed to start on February 17, 2009.

[14] Appellant relies on a February 27, 2009 notation in the chronological history which indicates a discharge in Los Angeles Superior Court No. TA054004 (case No. 2), effective October 28, 2008.  However, the relevant date for determining eligibility for a section 667.5, subdivision (b) enhancement is the date the defendant was released from prison custody, not the date the case was discharged.

As respondent observes, *James*, which held imposition of a five-year prior serious felony enhancement for one offense and a one-year prior prison term enhancement for another offense violated section 654 when the sentences for the two offenses had been served concurrently, has been rejected by numerous courts. *People v. Vaughn* (1989) 209 Cal.App.3d 398, 401, declined to follow *James*'s ruling or its reasoning, describing it as "wrongly decided based on an improvident concession by the Attorney General." (See also *People v. Irvin* (1991) 230 Cal.App.3d 180, 189 ["A defendant may be sentenced for a prior serious felony conviction and then also sentenced for a prior prison term for a different prior offense even though the convictions occurred at the same time and the sentences were served together"]; *People v. Medina* (1988) 206 Cal.App.3d 986, 989–991 (*Medina*) [refusing to follow *James* and holding "that a single previous prison commitment for two or more serious felony offenses may serve as the basis for sentence enhancements pursuant to both section 667 and section 667.5"].)

In *People v. Ruiz* (1996) 44 Cal.App.4th 1653, 1668, the court explained: "We held [in *Medina*] that section 667, subdivision (a) does not supersede or override section 667.5 where there are multiple convictions being served during a single sentence. (*People v. Medina*, *supra*, 206 Cal.App.3d at p. 990.) In part, we reasoned that the underlying purposes of section 667, subdivision (a) and section 667.5, subdivision (b) are different. The purpose of section 667, subdivision (a) is to visit greater punishment on recidivists who commit serious felonies, while section 667.5, subdivision (b) was intended to provide for additional punishment of the felon whose prior prison term failed to deter him or her from future criminal conduct. (*Medina*, *supra,* at p. 991.)" (See also *People v. Perez*, *supra*, 4 Cal.App.4th at pp. 909–910 [following *Vaughn* in its criticism of *James*].) As the *Vaughn* court explained: "Under section 667.5, the service of a prior prison term is the critical event which triggers imposition of an additional one-year term. Under section 667, the 'act' within the meaning of section 654 for prior conviction enhancements is the conviction. Under section 667.5, the enhancement requires service of a prison term and the 'act' is the conviction *plus* service of the prison term." (*People*

*v. Vaughn*, *supra*, 209 Cal.App.3d at p. 402; *People v. Perez*, *supra*, 4 Cal.App.4th at p. 910.)

In *Vaughn*, as in this case, there were two separate acts: (1) the conviction of a serious felony (§ 211) within the meaning of section 667 on April 12, 1995; and (2) the conviction of an unrelated felony (§ 261.5, subd. (a)) on July 20, 1995, and the service of a prison term within the meaning of section 667.5. That the prison term for the serious felony conviction "overlapped" the prison term imposed for the nonserious felony is immaterial as appellant's sentence was enhanced by two entirely separate "acts." (*People v. Vaughn*, *supra*, 209 Cal.App.3d at p. 402; *People v. Perez*, *supra*, 4 Cal.App.4th at p. 910.)

## DISPOSITION

The matter is remanded and the trial court is directed to modify defendant's sentence by striking one of the one-year enhancements imposed under Penal Code section 667.5, subdivision (b). The abstract of judgment and the records at the Department of Corrections and Rehabilitation shall be amended accordingly. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.


LUI, J.

We concur:


CHANEY, Acting P. J.


JOHNSON, J.


22